61 So.2d 901 (1952)
MEYER
v.
ST. PAUL-MERCURY INDEMNITY CO. OF ST. PAUL, MINN. et al.
No. 19905.
Court of Appeal of Louisiana, Orleans.
December 15, 1952.
*902 Rosen, Kammer, Hopkins, Burke & Lapeyre, New Orleans, for plaintiff and appellant.
Lemle & Kelleher, Harry B. Kelleher and Carl J. Schumacher, Jr., New Orleans, for St. Paul-Mercury Indemnity Co. defendant and appellee.
Adams & Reese, New Orleans, for Dr. Leopold L. Levy and Ætna Casualty and Surety Co., defendants and appellees.
Manuel I. Fisher and Herbert J. Garon, New Orleans, for Dr. Evelyn Katz Halle, defendant and appellee.
JANVIER, Judge.
Mrs. Eugenie Meyer, widow of Nathan C. Barnett, a lady 61 years of age at the time, having been advised by her family dentist, Dr. Armand R. Suarez, that it would be advisable that she have all of her remaining teeth extracted, employed Dr. Leopold L. Levy, an oral surgeon, one of the defendants, for the purpose of complying with this recommendation of Dr. Suarez. Arrangements were made for a room and for the use of an operating room in the Hotel Dieu, a local hospital. It was necessary that an anesthetic be administered, and during this process, which was being conducted by Dr. Evelyn Katz, also a defendant, one of Mrs. Barnett's upper front teeth became dislodged and found its way into one of her lungs. It was necessary that an expert, Dr. George Taquino, be employed to remove the tooth from the lung. This was successfully accomplished with the use of an instrument known as a bronchoscope.
For her pain and suffering and for the alleged permanent injury to her lung and for her losses and expenses, Mrs. Barnett has brought this suit based on the alleged malpractice of two of the defendants, the oral surgeon, Dr. Levy, who was to remove the teeth and the anesthetist, Dr. Katz, who was administering the anesthetic.
The other defendants are Daughters of Charity of St. Vincent de Paul, the Missouri corporation which operates the hospital in which the operation was to have been performed, St. Paul-Mercury Indemnity Company, its liability insurance carrier, and also Ætna Casualty and Surety Company, the liability insurance carrier of the oral surgeon, Dr. Levy.
In a supplemental petition plaintiff alleged that the policy of insurance which had been issued to the hospital corporation by St. Paul-Mercury Indemnity Company, through mutual error, had not specifically named the anesthetist, Dr. Katz, as an insured, and plaintiff prayed that the policy be reformed so as to include her as an insured, and that accordingly should it be held that the anesthetist had been at fault, judgment should run against this insurer not only as the insurer of the hospital, but also as the insurer of Dr. Katz.
Dr. Katz, the anesthetist, in her answer to plaintiff's petitions, original and supplemental, called the hospital corporation in warranty, alleging that she, the anesthetist, had been employed by the said hospital corporation and that when she had accepted employment she had advised the "administratrix" of the said corporation that she desired to secure a policy of insurance protecting her against claims of malpractice or physician's liability, and that she did not herself secure such a policy for the reason that the said "administratrix" and also the "Treasurer and/or *903 Business Manager" of the said hospital corporation had advised her that the said corporation "carried such insurance for the hospital and for all of its employees."
In her petition Mrs. Barnett charged that, while she was in the operating room "asleep or anesthetized and unconscious" and a patient of Dr. Levy, "one of her left upper front teeth was carelessly and negligently knocked out and further negligently and carelessly permitted after being dislodged to fall and descend" into her right lung. She further alleged that she "had no knowledge of what transpired or what caused or who caused the said tooth to be knocked out * * *; that the agencies or instrumentalites causing the said tooth to be knocked out * * * were completely and exclusively under the control of the * * * defendants * * * and * * * petitioner is entitled to judgment under the doctrine of res ipsa loquitur." She then, in the alternative that it should be held that the doctrine res ipsa loquitur has no application, alleged specific acts of negligence as follows:
(1) That Dr. Katz, while giving the anesthetic, negligently knocked or caused the said tooth to be knocked out, and failed to prevent it from descending into her lung in spite of the fact that she knew or ought to have known that there was danger that there might be such an occurrence, and in that Dr. Katz failed to notice that the tooth had been knocked out, and did not report that it had been knocked out and had fallen into her lung; and
(2) That Dr. Levy was negligent in that, although petitioner was under his care and supervision and he knew that in administering the anesthetic there was danger of such an occurrence, he did not himself "watch and observe the giving of the anesthetic and took no steps to prevent and did not prevent the said tooth being knocked out and falling into petitioner's lung * * *."
After a lengthy trial, there was judgment dismissing plaintiff's suit as against all defendants. The judge a quo gave the following reasons for dismissing the suit:
"After a review of the authorities, I have come to the conclusion that the doctrine of res ipsa loquitur does not apply in this case.
"I have further come to the conclusion that the plaintiff has failed to sustain the burden of proving negligence on the part of any of the defendants.
"Under the circumstances it is not necessary to pass on any of the other questions involved in the case."
There is little dispute as to the facts. The plaintiff was suffering from pyorrhoea, and her dentist, Dr. Armand R. Suarez, advised that she employ Dr. Leopold L. Levy, an exodontia oral surgeon, to remove her remaining teeth. Dr. Suarez says:
"* * * I recommended her to Dr. Levy. I said the teeth were pyorrhetic and there was loosening of the teeth. The teeth were diseased. I recommended her to Dr. Levy."
Later he said:
"* * * She was losing them little by little."
Dr. Levy says that Mrs. Barnett called on him and advised him that all of her remaining teeth were to be removed, and he says that he "looked in the mouth" and "could see there was one particular loose one," but that he did not examine each one particularly. He said that the loose tooth which he saw was not the one which later found its way into Mrs. Barnett's lung, and he later said that he could not say whether the tooth which found its way into Mrs. Barnett's lung at that time "was loose" or "firm".
Since it was oral surgery which was to be performed, it was necessary that there must be resorted to some method of administering the anesthetic which would leave the mouth unobstructed. The method adopted was what is referred to by the various doctors as nasal endotracheal intubation. This method requires that a rubber tube be passed through the nose and that the tip of it be seated behind the trachea. To insert this tube there must *904 be employed a laryngoscope, the one used in this case being known as a Guedel laryngoscope, which is a metallic instrument the body of which is held in the hand of the anesthetist, and which body is about the size of the ordinary household flashlight. Attached to the upper end of this instrument is a flat piece of metal several inches in length, about as wide as the blade of a wide table knife, and which is about an inch or more in thickness from the top to the bottom, at the rear end, and tapers to about one-half inch at the forward end. On the forward end of this upper extension there is a flashlight, which enables the anesthetist to see just where the rubber tube is being placed as it enters the throat after having passed through the nose. When this laryngoscope is inserted into the mouth, it obviously occupies almost the entire opening between the lips.
It is very evident that it was while this laryngoscope was in the mouth of Mrs. Barnett and the tube was being placed in position that one of her front upper teeth was knocked out or became dislodged spontaneously and found its way into her lung.
Dr. Katz, who was administering the anesthetic and who was exclusively in the employ of the hospital corporation, says that just after the laryngoscope was removed and while she, Dr. Katz, was getting the anesthetic "under way" through the tube, she and Dr. Levy noticed blood in Mrs. Barnett's mouth and found that there was an upper front tooth missing.
Dr. Levy who, in his joint answer with the insurer, had averred that he had no knowledge "that plaintiff's tooth was knocked out and lodged in her lung until after she was anesthetized," stated that the words "knocked out" had been used inadvertently, and that what he meant was that he had found that the tooth was missing, and that he had immediately ordered that an x-ray be made, and that it was then that the tooth was discovered in Mrs. Barnett's lung.
Since there was no evidence which could be pointed to as positively showing that the tooth had actually been knocked out, counsel for plaintiff argued that the doctrine res ipsa loquitur is applicable and that, as a result of the effect of this doctrine, the defendants are under the necessity of showing that there was no fault on the part of Dr. Levy or Dr. Katz.
And we find counsel in a controversy over the question of whether, in such a case as this, the doctrine res ipsa loquitur is applicable. The plaintiff vehemently contends that, as a result of that doctrine, she is under no obligation to show negligence on the part of anyone, and that if the defendants would escape liability, the burden is on them to show that there was no fault from which the unfortunate occurrence resulted.
The defendants, on the other hand, stoutly maintain that the doctrine has no application here and that there can be no recovery since the plaintiff has not borne the burden of proving negligence on the part of anyone. They assert that for either or both of two reasons the doctrine may not be relied upon here. First, they say that the doctrine has no application in a malpractice suit against a physician, or a surgeon, or a dentist for the reason that never should a person engaged in the practice of such a profession be required at his peril to explain why a certain treatment or a certain operation did not produce the desired and expected result. Second, they say that even if, in any suit against such professional defendant, the doctrine may, under some circumstances, be applied, it should never be applied where there are two or more defendants, and it is charged that any one or more of them may have been at fault, but no particular one is singled out as having, through negligence, caused the occurrence.
The first contention, that the doctrine can never be applied in a suit against a physician, or a surgeon, or a dentist, is most interesting, and it must be conceded at the outset that it is well settled that the doctrine can not have application where there is involved the merits of a diagnosis or of scientific treatment. No such professional person should be required at his peril to explain why any particular diagnosis was not correct or why any particular scientific treatment had not produced the desired result.
*905 In 70 C.J.S., Physicians and Surgeons, § 62, p. 990, it is said that:
"Negligence on the part of a physician or surgeon is not presumed, but must be affirmatively proved."
In Shain's Res Ipsa Loquitur, Presumptions and Burden of Proof, page 467, we find the following:
"The application of this doctrine to medical cases is limited. It is the general rule, in actions for malpractice, that there is no presumption of negligence from the mere failure of judgment on the part of a doctor in the diagnosis or in the treatment he has prescribed, or from the fact that he has been unsuccessful in effecting a remedy, or has failed to bring about as good a result as someone else might have accomplished, or even from the fact that aggravation follows his treatment. As said by Chief Justice Taft (then sitting on a federal circuit bench):
"`A physician is not a warrantor of cures. If the maxim, "res ipsa loquitur," were applicable to a case like this, and a failure to cure were held evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial responsibility for nearly all the "ills that flesh is heir to."'"
In Lett v. Smith, 6 La.App. 248, appears the following:
"The general obligation of the physician in his treatment of his patient is to follow the usual practice of the profession, and when so doing the law declares that he is not responsible for results, and it seems to us that it would be rather paradoxical for the result of the treatment to be considered as a circumstance in determining whether or not the physician had followed the usual practice, the law being that he is not responsible for results."
We have no doubt at all that the doctrine of res ipsa loquitur has no application where, in the ordinary suit against a physician, a surgeon, or a dentist for malpractice, all that is shown is that the desired result was not accomplished. On the other hand, however, we think that where the complaint is not based on the failure to obtain satisfactory results, but is based on the charge that, during the rendering of the professional services, there occurred some untoward event, or some omission or act from which there resulted something not ordinarily found to result during such treatment or operation, the physician, or the surgeon, or the dentist may be required to show that such unusual occurrence did not result from negligence on his part.
In Whetstine v. Moravec, 228 Iowa 352, 291 N.W. 425, 437, there appears a very interesting discussion of the difference between the failure to secure results and the occurrence of something most unusual and not ordinarily found where the services performed followed the usual procedure of those skilled in that particular practice. In the Whetstine case, the court quoted with approval from Evans v. Roberts, 172 Iowa 653, 154 N.W. 923, as follows:
"The very careful opinion of the late Chief Justice Weaver in that case draws the distinction between the two classes of cases we have suggested. He was discussing a case in which a surgeon was operating for the removal of adenoids. One of the appliances slipped, and the surgeon inflicted a very severe wound with his instrument. * * *"
We see a vast distinction between the situation in which a surgeon performs an operation in the usual, customary way and yet does not accomplish the desired result, and another situation in which a surgeon, while performing an operation, overlooks the fact that he has left in the abdomen, or in the wound, a sponge, or an instrument, or some other foreign matter. In the former case the doctrine of res ipsa loquitur should have no application. Surely the surgeon should not be required at his peril to show why the operation did not prove successful. In the latter case we think it obvious that the surgeon should be required to explain the most unusual occurrence. Illustration of this type of case is found in *906 Whetstine v. Moravec, supra, in which the facts are quite similar to those found here. An oral surgeon, while extracting a tooth, permitted a part of the root of the tooth to "pass into plaintiff's lungs". The court held the doctrine of res ipsa loquitur to be applicable.
In Ales v. Ryan, 8 Cal.2d 82, 64 P.2d 409, and Armstrong v. Wallace, 8 Cal. App.2d 429, 47 P.2d 740, it was held that the doctrine had application where foreign matters were left in the abdomen.
The distinction which we have in mind is well stated in syllabus No. 3, in Sanders v. Smith, 200 Miss. 551, 27 So.2d 889:
"In determining applicability of res ipsa loquitur doctrine to malpractice action against physician or surgeon, real question generally is whether in process of operation any extraordinary incident or unusual event, outside of routine of action of its performance occurred and beyond regular scope of its customary professional activity in such operations, which, upon explaining, would themselves reasonably speak to the average man as to negligent causes of untoward consequence, and if there were such extraneous interventions doctrine would apply requiring defendant to explain the matter."
We conclude that the mere fact that the anesthetist, who was administering the anesthetic, and the dentist, who was to remove the teeth, were professional people both engaged in the performance of professional duties, does not in itself prevent the application of the doctrine res ipsa loquitur, and that the doctrine in certain situations such as have been suggested, may have application.
And we pass to a consideration of the contention of the defendants that the doctrine cannot be applied in this case for the reason that there were two or more persons present, or who should have been present, and who were or should have been diligent in observing the situation and in preventing the occurrence, and that where such an occurrence does take place, where the negligence of one or more persons may have caused the injury, the doctrine can have no application.
It is true that ordinarily the doctrine may not be relied upon to place the burden of producing evidence upon any one or all of the several persons, any one of whom might have been negligent. The rule itself is based on the fact that some individual (the defendant) under the circumstances must have had knowledge as to the reason of the occurrence, whereas the other (the plaintiff) could not have had such knowledge. Particularly is this true where the instrumentality which caused the damage was under the exclusive control of the former (the defendant).
In Piacun v. Louisiana Coca-Cola Bottling Co., La.App., 33 So.2d 421, 423, we said:
"* * * The doctrine, where it is applicable, is based on the theory that because the thing which causes the accident is completely within the control of the defendant, or because the defendant alone can be expected to have knowledge as to the cause, the explanation must come from that defendant. * * *"
The reason for the rule is also stated by the Supreme Court in Dotson v. Louisiana Central Lumber Company, 144 La. 78, 80 So. 205, 207, as follows:
"Although the general rule of law is that a plaintiff who claims damages must allege and prove the facts necessary to establish the negligence of defendant, upon which he predicates his demand, it is equally a well-recognized exception to that general rule that, where the cause of the accident by which the damage was inflicted is more properly within the knowledge of defendant, the accident itself makes out a prima facie case, and the burden is upon the latter to show absence of negligence. Res ipsa loquitur."
Consequently, where there is more than one defendant, any one of whom might have been at fault, it is ordinarily not proper to say that any one had exclusive control of the instrumentality or that any *907 one had or should have had exclusive knowledge as to how or why the accident occurred. Thus in Dunaway v. Maroun, 178 So. 710, 712, the Court of Appeal for the Second Circuit said:
"The rule will not be applied where the evidence discloses that the injury might have occurred by reason of the concurrent negligence of two or more persons or causes, one of which was not under the management and control of the defendant. * * *"
See, also, Lejeune v. Collard, La.App., 44 So.2d 504.
In Monroe v. H. G. Hill Stores, La.App., 51 So.2d 645, 649, we said:
"There is some doubt as to whether the doctrine of res ipsa loquitur is applicable against either defendant where there are two or more and the instrumentality which causes the damage is not exclusively under the control of one. * * *"
We also discussed the question of Guiteau v. Southern Parking Co., La.App., 49 So.2d 880.
However, we are of the opinion that there are certain situations in which the doctrine may be applied, although there are two or more defendants any one of whom, through negligence, may have been responsible for the occurrence. We think that our Supreme Court clearly recognized this when, in Gerald v. Standard Oil Co. of Louisiana, 204 La. 690, 16 So.2d 233, 236, in which there were three defendants, the court said:
"* * * The controversy is one in which the doctrine of res ipsa loquitur is possible of application; * * *".
In a case involving, among other issues, the identical question now under discussion, Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687, 688, 162 A.L.R. 1258, the Supreme Court of California held that the mere fact that several doctors and surgeons were involved did not prevent the application of the doctrine in a suit against all of them. And in Ales v. Ryan, supra, and Armstrong v. Wallace, supra, it was held that the fact that the plaintiff sued both the hospital and the physician for failure to remove a sponge from the abdomen during the operation did not preclude the application of the doctrine res ipsa loquitur.
In the Ybarra case, supra, this particular issue was especially raised. The court stated that one of the principal defenses was
"* * * that where there are several defendants, and there is a division of responsibility in the use of an instrumentality causing the injury, and the injury might have resulted from the separate act of either one of two or more persons, the rule of res ipsa loquitur cannot be invoked against any one of them; * * *."
But, as we have already shown, the court did not agree with this contention, holding that under certain circumstances the mere fact that there are two or more defendants does not prevent the application of the doctrine. The court said that a case of the type which was there presented and which is now under consideration by us "is of a type which comes within the reason and spirit of the doctrine more fully perhaps than any other." And we quite agree with this statement. A passenger, awake in a passenger car, may, in the event of a derailment or other accident causing injury, rely upon the doctrine of res ipsa loquitur; a person walking along the street and injured by falling objects may rely upon it. Why then should the unconscious patient in the hospital not be permitted to rely entirely upon the doctrine and to call upon those into whose custody he had submitted his unconscious body to show what caused the most unusual occurrence?
Our conclusion is that the doctrine res ipsa loquitur is applicable and that, as a result of its application, the defendants are required to show that there was no negligence on their part.
Where the doctrine res ipsa loquitur is applied, the defendant need not show just what was the cause of the occurrence, but must show that there was no fault from which the accident resulted. We think the situation is the same as that *908 which is present where a passenger is injured on a common carrier, and in which situation, the Supreme Court had the following to say in Cusimano v. New Orleans Public Service, 170 La. 95, 127 So. 376, 378:
"Our conclusion is that the doctrine of the Hopkins, Spurlock, and LeBlanc Cases is correct in so far as these cases hold that, where a passenger is injured, the burden of proof is on the carrier to show that it was free from any negligence which might have caused the accident, but that the doctrine of those cases is too broad (if such be their doctrine) in holding that the carrier can discharge such burden of proof only by showing how and why the passenger was injured, even though it does show that the injury occurred through no negligence of its own."
It is the contention of counsel for plaintiff that Dr. Katz was negligent in so inserting the laryngoscope as to permit it to come into contact with the teeth of plaintiff, and that Dr. Levy was at fault in not himself supervising the insertion of the laryngoscope and in not warning Dr. Katz that Mrs. Barnett's teeth were loose and that some of them might become dislodged.
Ordinarily the physician, or the surgeon, or the dentist is held to be not liable for undesired or unexpected results if it is shown that he possesses and exercises such skill and knowledge as are possessed and exercised by others in good standing practicing in similar localities. Mournet v. Sumner, 19 La.App. 346, 139 So. 728.
In Sanders v. Smith, 200 Miss. 551, 2, So.2d 889, 891, the Supreme Court of Mississippi, citing Engelking v. Carlson, 13 Cal.2d 216, 88 P.2d 695, said that
"the law has never held a physician or surgeon liable for every untoward result which may occur in medical practice. It requires only that he shall have the degree of learning and skill ordinarily possessed by physicians of good standing practicing in the same locality, and that he shall use ordinary care in applying that learning and skill to the treatment of his patient. * * *"
In Wells v. McGehee, 39 So.2d 196, 199, the Court of Appeal for the First Circuit said:
"The law seems to be well-settled:
"That where the physician or surgeon uses all the customary precautions practiced by the profession in the particular locality, no liability is incurred. Thus, the highest degree of skill and knowledge is not required in every case, but only such skill and knowledge and practices as are common with the profession in the locality where the physician or surgeon happens to practice."
There can be no doubt that both Dr. Levy and Dr. Katz had more than the ordinary background of education and experience. Dr. Levy had been practicing dentistry for 26 years, specializing in exodontia oral surgery. He was a graduate of the Loyola Dental School of New Orleans and of the Dental School of the University of Chicago, and he said that for 19 years he had been doing nothing but oral surgery. Dr. Katz had graduated from Newcomb College and had taken her master's degree at Columbia University. She was elected to membership in the honorary fraternity, Phi Beta Kappa, and had graduated in medicine at Louisiana State University. Dr. John A. Adriani, admittedly an expert in anesthesiology, said that unquestionably Dr. Katz was an expert in that particular branch of the medical profession. Dr. Adriani was asked:
"Would you, in your opinion, state that Dr. Katz has the degree of skill possessed by normal practitioners in this community?"
and he answered: "Yes." He was further asked:
"Would you say that in your opinion Dr. Katz is qualified to perform nasal as well as oral intubation in the rendering of anesthetic?"
and he answered:
"Yes; she has all the qualifications necessary."
*909 It is the contention of the defendants that there was no negligence on the part of either Dr. Katz or Dr. Levy, and that the tooth fell out almost of its own accord; that it is almost impossible for an anesthetist to use a device such as was necessarily used in this case without permitting it to come into contact with the teeth of the patient, with the possible result that a tooth may be dislodged without negligence on the part of the anesthetist.
Dr. Adriani is the Chief of Anesthesiology at the Charity Hospital in New Orleans and is an associate surgeon at Tulane University and Louisiana State University. He also teaches anesthesia on the dental staff of Loyola University. He has written three text-books on the subject. He stated that such an occurrence as caused this litigation may take place in spite of the exercise of the most extreme care. He said that when the Guedel laryngoscope is used "it is bound to come in contact with the teeth." Pointing to the picture of the instrument which was exhibited during the trial of the case, he said:
"You can see here there are teeth marks on this blade from putting it in the mouth and where it has come in contact with the teeth. * * * The upper teeth. * * *".
He also said that in using such an instrument
"you have to spend a good deal of time to the care of a lot of details quickly, such as putting the tube in; as soon as the tube is in you withdraw it (the laryngoscope) and the first thing you have to do is connect back the apparatus to that tube to resume the anesthesia."
He said that the attention of the anesthetist must be focused on the laryngoscope, and that the only thing the anesthetist can see is the larynx; that in this process the patient may have muscle spasm or excitement, explaining "they try to clench down in their jaw, or tighten up their jaw." And he followed this with the statement:
"I have seen patients with very carious teeth who, without touching the mouth or without the laryngoscope being done, those teeth fell out."
This expert said:
"We always watch the teeth carefully and see that they don't fall out".
But he followed this immediately with the statement:
"When you visualize the larynx it is possible you might damage the teeth and not recognize it until you finish connecting up your apparatus."
While Dr. Adriani said that he himself had not had an experience similar to that which occurred here, he added that it had
"happened in situations which I have been in. I am familiar with other cases of this sort. Fortunately it hasn't happened to me but it can happen. The patient is breathing heavily and the tooth falls back in the pharynx and it can be sucked in. I have seen other things sucked in."
A further statement made by him is significant:
"On a number of occasions when it happened to me, when a tooth was dislodged, a bystander standing there watching the surgeon or the dentist whoever is working therehas said to me `You broke that tooth.' I have been told that by bystanders because I was busy connecting the apparatus up."
Dr. Katz said that while she had not examined Mrs. Barnett's teeth before she inserted the laryngoscope, she had observed them and that while she did not particularly consider the risk of any teeth falling out, "the risk is inherent in that particular type of procedure."
So far as Dr. Katz is concerned, we conclude that there was no negligence on her part. She possessed all the necessary skill, and the procedure which she followed was the normal procedure employed by others in this community skilled in that particular profession.
It is said that Dr. Levy was negligent in that he did not remain at the side of the patient while the laryngoscope was being inserted, and in that he did not warn the anesthetist of the danger resulting *910 from the fact that Mrs. Barnett's teeth were in a carious condition. Dr. Levy says that he did not know that the upper front tooth was lose. He did not particularly examine the teeth, because the patient had been sent to him for the purpose of extracting them, Dr. Suarez having already examined them. He did notice that one of the teeth was loose, but that was not the tooth which caused the trouble. He said, and the record convinces us, that it is not customary for a surgeon, or an oral surgeon, to remain alongside the patient while the anesthetic is being administered.
It is interesting to note that Dr. R. E. Rougelot, the family physician of plaintiff who was present when Dr. Taquino was removing the tooth from plaintiff's lung, said:
"* * * we do not interfere with the anesthetist when the anesthetist is giving anesthetic. Her condition is noted and observed by the anesthetist. Of course, the anesthetist reports to the doctor if any change in the patient's condition takes place."
Counsel for Dr. Levy quoted the following from Dr. Louis J. Regan's work entitled: "The Doctor and Patient and the Law":
"Whenever a nurse in the employ of the hospital, or any other person except a licensed physician, administers an anesthetic, the operating surgeon is burdened with liability for the negligence of the anesthetist, if there is any, On the other hand, if the anesthetist is a licensed physician, qualified in anesthesia, and if the entire charge of the administration of the anesthetic is placed in his hands, the operating surgeon is not, and it is submitted that he cannot reasonably be, liable for the anesthetist's negligenceexcept, of course, as such negligence is observed or, by the exercise of reasonable diligence, should be observed, and nothing done about it."
In Wiley v. Wharton, 68 Ohio App. 345, 41 N.E.2d 255, the Court of Appeals of Ohio, Summit County, held that the surgeon employed to perform an operation is ordinarily not liable for the negligent acts of the anesthetist.
All in all, we are convinced from the record that Dr. Levy was not at fault.
There is no doubt that it is difficult for the non-medical mind to understand how there could have been such an occurrence as this without there having been fault on the part of someone, and without there being a right to redress in the unfortunate sufferer who employed experts and placed herself entirely in their care and who awakened to find that she had suffered injury without any fault and with no knowledge as to the cause.
However, it is just in such matters as this that we must turn to the experts and must be guided largely by their views as to whether or not those in charge of the patient did all that they were required to do and whether, in spite of the use of "that degree of skill and care which is usually possessed and exercised by practitioners * * * in good standing", the unfortunate result nevertheless occurred. See Brashears v. Peak, La.App., 19 So.2d 901, 903.
It is interesting to note that, in the Peak case, the court concluded from expert testimony that it is "perfectly natural" that often in extracting teeth, parts of the root are overlooked and permitted to remain in the mouth of the patient.
We have no doubt of the correctness of this conclusion, and we refer to it only because, in Perrin v. Rodriguez, La.App., 153 So. 555, we found that there had been negligence in failing to remove all of the broken parts of the tooth from the patient, but we did so because, in that case, it had been "conceded" by counsel.
Our conclusion is that both Dr. Levy and Dr. Katz did all that reasonably careful practitioners, skilled in their respective professions, could have done, and that consequently there is no liability in either. The necessary consequence is that there is no liability in any of the defendants.
Because of the conclusion we have reached that there was no fault on the *911 part of either of the doctors, it is not necessary that we consider the other myriad issues which would otherwise have been very interesting. We need not consider whether Dr. Katz was an employee of the hospital within the contemplation of Article 2320 of the LSA-Civil Code, and we need not consider whether or not the hospital, because of its charitable functions, was entitled to immunity from suit; we need not consider whether the policy of the hospital should be reformed so as to include Dr. Katz as an insured, nor need we consider whether the hospital should be held liable to Dr. Katz in warranty. Since there was no fault on the part of Dr. Levy or Dr. Katz there is no liability in any of the defendants.
Accordingly, the judgment appealed from is affirmed at the cost of appellant.
Affirmed.