76 So.2d 576 (1955)
Walter FAIRLEY
v.
Dr. Karl L. DOUGLAS.
No. 20471.
Court of Appeal of Louisiana, Orleans.
January 3, 1955.
*577 Clarence de Lucas and W. W. Young, Jr., New Orleans, for plaintiff and appellee.
Lemle & Kelleher and Carl J. Schumacher, Jr., New Orleans, for defendant and appellant.
McBRIDE, Judge.
On October 27, 1953, plaintiff engaged the defendant, a dentist who had practiced his profession in New Orleans for the past twenty-four years, to remove an impacted wisdom tooth. Plaintiff now seeks recovery for the damage claimed to have resulted from alleged negligence on the part of defendant in leaving a fragment of steel or other metal which had broken off of one of defendant's dental instruments in plaintiff's lower left third molar socket.
The answer denies all of plaintiff's allegations and particularly the allegation defendant left the fragment of steel in plaintiff's jaw; it is also averred that defendant in extracting his tooth and treating plaintiff used the customary and approved procedures and dental equipment and exercised reasonable care, skill, and diligence.
In his suit plaintiff claims the sum of $960.20, of which $813.80 is for pain and suffering and certain alleged expenses, and $146.40 represents the alleged loss of wages for a period of six days. He recovered judgment for $946.40 and defendant appealed. Plaintiff who has made answer to the appeal prays that the judgment be increased to the amount prayed for in the petition.
On October 27, 1953, plaintiff called at Dr. Douglas' office complaining of a fatty tissue in his mouth, and after making an X-ray, Dr. Douglas' conclusion was that the lower left third molar was impacted and the patient was told to return the next day and the impacted tooth was then extracted. There was much discussion as to how many times plaintiff returned to defendant's office afterward, plaintiff claiming that he made visits to Dr. Douglas' establishment for a period of about three weeks, whereas the office assistant, testifying from notations which she claims she had entered in a book, was sure that plaintiff was seen by Dr. Douglas on four occasions in all, the first on October 27th, when the X-ray picture was made, the second on October 28th for the extraction, and on November 3rd and 6th for postoperative treatment.
At any rate, plaintiff testified that because Dr. Douglas could not relieve the swelling of the jaw and the accompanying pain, he went to Charity Hospital where, on November 23, 1953, a metal fragment measuring 1/8" by 1/8" was removed from the third molar socket. Several X-rays, made at the hospital, show plainly, even to a layman, that a foreign body was embedded in plaintiff's jawbone. According to the hospital record, plaintiff went to the out clinic for irrigation of the wound on two subsequent occasions.
We feel certain that the bit of metal became lodged in plaintiff's jaw during the course of the extraction of the tooth by Dr. Douglas, because the X-ray made by him on the day preceding the operation showed no foreign body at the situs of plaintiff's impacted tooth.
This X-ray plate was never produced and Dr. Douglas' reason for its nonproduction is that it had been misplaced in his office. However, his recollection was that the X-ray plate was negative for the presence of a foreign body in plaintiff's mouth.
Dr. Douglas concedes that in extracting plaintiff's tooth he used, among others, an instrument which dentists refer to as an elevator. Several of such instruments were exhibited during argument of the case, and *578 the best description we are able to give of an elevator is that it is about five inches long, is made entirely of metal, and has a heavy handle from which protrudes a fairly thin but hard steel blade bent flatwise and sideways to a 90° angle near its end, the point being somewhat blunt. We gather from the record that the dental surgeon uses the elevator by inserting the bent end under the patient's tooth and then by manual pressure raises the tooth either entirely out of the socket or positions the tooth so that it may be extracted by the use of forceps.
After placing the bit of steel removed from plaintiff's jaw at the hospital alongside the point of one of the elevators shown us and comparing them, we are convinced that the metallic fragment at one time had constituted the pointed end of a dental elevator. Defendant's counsel in brief seem to concede that fact.
While there is a conflict in the testimony of defendant's experts, we are entirely satisfied that it is not uncommon for elevators to break while being used by a dental practitioner in the course of a tooth extraction. This was made abundantly clear by Dr. Leopold L. Levy, an eminent dental practitioner in this city having many years of experience, who testified on behalf of defendant. Dr. Levy said "I have broken them myself." From the transcription of his testimony we are led to the belief that one of the purposes of Dr. Levy's testimony was to prove to the satisfaction of the court the fact that dental elevators occasionally break.
The defendant agrees with Dr. Levy in that regard and states that he has had the same experience. However, Drs. Creuzot and Talbot, who are experienced practitioners of dentistry and also appeared as expert witnesses on behalf of defendant, heartily disagreed with Dr. Levy and the defendant, both claiming that they had never on any occasion known an elevator to break.
Although, as we said, it appears that defendant produced Dr. Levy for the purpose of proving that elevators are sometimes broken by the dentist, strangely enough Dr. Douglas at all times vehemently denied that he had broken any of his instruments in extracting plaintiff's tooth, and Thelma Colar, defendant's employee, who assisted at the operation joins in such denial.
Dr. Douglas went so far as to testify that an examination which he himself had made disclosed that none of the instruments which he had utilized had been broken or were defective. He stated:
"A. Not during that extraction. I had no broken instruments.
"* * * * * *
"A. Nothing happened. I say when you finish with the instrument you look at it and turn it over to your assistant. If something would happen during the operation you would know it. (Italics ours.)
"Q. I'll ask you again, did you check your dental instruments after extracting Walter Fairley's tooth? A. The only check I did, I look at the instrument all the time to see, just like I look at the tooth to see if the root is broken off of it. The instrument was there in good shape. (Italics ours.)
"* * * * * *
"A. * * * I say after I finish the operation I check my instruments, not only do I check them, I have my assistant check them."
Thelma Colar's testimony is:
"Q. Do you know whether or not any instrument broke while Dr. Douglas was working on this person? A. No.
"* * * * * *
"Q. Well, is it a policy in Dr. Douglas' office for you to check the instruments after an extraction, or does he always do it, is that one of your jobs to do it? A. It is my job to take care of the instruments.
*579 "Q. And check them after the extraction? A. Yes.
"Q. You don't know whether he checks them after an extraction or not? A. Well, he could, I don't watch him."
The contention is made that when plaintiff returned on the several subsequent visits to Dr. Douglas' office complaining of the jaw being swollen and pain, Dr. Douglas should have realized that these symptoms were abnormal and an X-ray of the socket should have been made so as to determine the cause of the swelling and the pain.
However, defendant and his three experts are in agreement that it is not unusual for the patient to suffer swelling and pain after a tooth extraction and that postoperative X-rays are not usually made until at least ten days or more after the operation and only when the symptoms of swelling and pain continue.
Dr. Creuzot says he does not usually make post-operative X-rays until four to six weeks after an extraction, but this expert mentioned that if he had broken an instrument, he would have deemed it necessary to make an X-ray immediately. His testimony is:
"A. If I had seen that tooth come out cleanly, I would know there would be no tooth there.
"Q. How about a piece of bone? "A. Well, a piece of bone possibly could have been there.
"Q. Or broken instrument?
"A. Oh, well, if I had broken an instrument I would see that immediately after the extraction and I'd make the X-ray. If I was going to make an X-ray at all I would make it immediately, not wait 4 to 6 weeks."
The law involving the question of the amount of skill required of physicians, surgeons, and dentists has been set forth clearly in the recent case of Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781, 782, as follows:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. Stern v. Lanng, 106 La. 738, 31 So. 303; Roark v. Peters, 162 La. 111, 110 So. 106; Comeaux v. Miles, 9 La.App. 66, 118 So. 786; Freche v. Mary, La.App., 16 So.2d 213; Brashears v. Peak, La.App., 19 So.2d 901; Wells v. McGehee, La.App., 39 So.2d 196. See also 70 C.J.S., Physicians and Surgeons, § 41."
The defendant's contention is that he is to be absolved from liability because the plaintiff had not proven that he failed to use that degree of skill ordinarily employed under similar circumstances by the members of the dental profession in good standing in New Orleans.
We think the defendant clearly liable in damages unto the plaintiff as it appears to our complete satisfaction that he had failed to use the professional skill required by law. Both Dr. Douglas and Thelma Colar, his employee, say they made examination of the instruments used and that none had broken during the extraction of the plaintiff's tooth. In view of the statement of Dr. Douglas himself, which is supported by Dr. Levy, that elevators occasionally break, it stands to reason that the only purpose Dr. Douglas could have had in making the examination was to satisfy himself that no such accident had occurred during the particular operation.
We fail to understand how both the doctor and his assistant could have made the examination and have overlooked the broken elevator. We can readily appreciate that in the procedure of extracting a molar, and especially an impacted tooth, there, on *580 most occasions, results a great deal of blood in the patient's mouth, and this can be attested to by almost anyone who has had the experience of having a tooth extracted. It is a well-known fact that blood not only covers the instrument which the dentist is using but also sometimes covers his hand. Under these circumstances, it would be exceedingly simple and understandable for a dentist to fail to notice that a small point was missing off the extreme end of one of the instruments. But here we have a dentist whose instruments, after the operation, were examined not only by himself but by his employee whose duty it was to make certain that none of the instruments had been broken. If it can be said that the defendant himself was not negligent, then it cannot be gainsaid that Thelma Colar, defendant's employee, who was specifically charged with the examination of Dr. Douglas' instruments, was guilty of negligence for which, under the doctrine of respondeat superior, Dr. Douglas is liable.
Neither Dr. Levy nor the defendant stated what steps are taken when an instrument breaks in the mouth of a patient, and the only intimation we have of what a dentist should do in that contingency emanates from Dr. Creuzot, who stated that while he had never experienced the breaking of an instrument, he would, if one did break, make an X-ray of the patient's mouth immediately. Dr. Creuzot, although he did not say so, obviously would make the X-ray as a precautionary measure in order to ascertain what had become of the broken portion of the instrument and how the patient in the chair might be affected by it.
Dr. Douglas himself said "If something would happen during the operation you would know it" and in view of his statement it is difficult to understand why he did not "know" the elevator had broken and that the broken particle might be lodged in the patient's mouth. Even if we disregard the defendant's statement that he would have known it if the elevator had broken, then surely the visual examination of the instrument made afterward should have brought home to defendant that there had been an accident and he should have taken every precaution to protect his patient from the consequences thereof.
From the record we cannot say what a member of the dental profession in good standing in this locality would have done in the event he experienced a breaking of an instrument during an operation were it not for Dr. Creuzot, who stated that in that event he would make an immediate X-ray of the patient. Dr. Douglas had every reason to know that the elevator had broken in plaintiff's mouth and that the procedure outlined by Dr. Creuzot was the one to pursue under the circumstances.
In Perrin v. Rodriguez, La.App., 153 So. 555 and Comeaux v. Miles, 9 La.App. 66, 118 So. 786, we held the defendants, who were dentists, guilty of negligence and liable in damages for permitting portions of teeth to remain in the sockets in the jawbones of the plaintiffs.
The cases of Mournet v. Summer, 19 La. App. 346, 139 So. 728, and Roark v. Peters, 162 La. 111, 110 So. 106, cited by defendant, are inapposite as the facts therein are easily differentiated from those to be found in the instant case.
There seems to be no dispute that plaintiff lost six days' pay, but the claim of plaintiff that he was a bricklayer earning $24.40 per day is challenged. Defendant's counsel point up that portion of the Charity Hospital chart setting forth that plaintiff was a man earning $35 per week, and counsel argue that this information was undoubtedly given at the hospital by plaintiff and shrouds his sworn testimony with much doubt. We cannot say whether plaintiff declared that his earnings were $35 per week, nor can we say, if plaintiff did so declare, what might have prompted him to do so. It could well be that the notation was the result of a mistake on the part of the person who wrote out plaintiff's chart, and considering this possibility, we prefer to accept for the purpose of assessing damages against defendant the sworn statement made by plaintiff on the trial of the case. We believe that he did sustain the loss of *581 six days' pay as a result of the defendant's negligence, and that his earnings at the time were $24.40, and his loss as a result of not being able to carry on his occupation amounts to $146.40.
We are in accord with the conclusion of the trial judge that plaintiff is not entitled to recover the item of $13.80 which he claims to be the expenses occasioned in connection with his treatment.
The trial judge awarded $800 for pain and suffering, but our impression is that the award is excessive. The small bit of steel was removed on November 23, 1953, the wound was then sutured, and plaintiff was injected with penicillin. He made two other visits to the hospital for the removal of the sutures and for irrigation of the wound. The chart shows that no infection ever developed and the procedure necessary to remove the steel from the jawbone appears to have been relatively simple.
The testimony shows very plainly that the extraction of an impacted wisdom tooth usually causes the patient to experience swelling and suffer pain for ten days or longer after the operation, and unquestionably some of plaintiff's swelling and pain was occasioned by the removal of the tooth. We think in all fairness to the defendant the amount awarded for pain and suffering should be reduced to $400.
Defendant complains that the lower court over counsel's objection erroneously admitted two pages of the hospital report as evidence, but there is no need to pass on the correctness of the ruling. Even if we eliminate from all consideration the two pages of the report in question, the result would remain the same.
For the reasons assigned, it is ordered, adjudged and decreed that the amount of the judgment appealed from be reduced to the sum of $546.40, and as thus amended and in all other respects the judgment is affirmed.
Plaintiff-appellee is to pay the cost of appeal.
Amended and affirmed.