**Lorna Carr LEAVELL and James R. Leavell, Plaintiffs,**

v.

**ALTON OCHSNER MEDICAL FOUNDATION, d/b/a Ochsner Foundation Hospital, Ochsner Clinic, a partnership and the partners thereof, Dr. Alton Ochsner, Dr. Curtis Tyrone, Dr. Guy A. Caldwell, Dr. Edgar Burns and Dr. Francis E. LeJeune, individually and as partners, Dr. Thomas Duncan, Dr. Seymour Ochsner, Orleans Service Corporation, Aetna Casualty and Surety Company and Maryland Casualty Company, Defendants.**

Civ. A. No. 9462–B.

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 8, 1962.

**806**

Terriberry, Rault, Carroll, Martinez & Yancey, Edward S. Bagley, William E. Wright, New Orleans, La., for plaintiffs.

Adams & Reese, St. Clair Adams, Jr., Richard C. Baldwin, New Orleans, La., for defendants.

1. Louisiana follows the majority rule. See 70 C.J.S. Physicians and Surgeons § 41.

2. The neck of the femur, or thigh bone, joins with the pelvic bone to form the hip joint.

3. The insured defendants operate the Ochsner Foundation Hospital near New Orleans.

J. SKELLY WRIGHT, District Judge.

Under Louisiana law,[1] a physician or surgeon "is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case." Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781, 782. It is this standard which must be applied to the unfortunate facts of this case.

On October 23, 1958, Mrs. Lorna Carr Leavell, a lady aged 65, fell on her buttocks and broke the neck of her femur.[2] The defendants[3] missed the diagnosis. Six months and much misery later, a second series of x-rays disclosed the fracture. It was also noted that her right leg had shortened one and one-fourth inches. She, along with her husband, sue for malpractice, alleging improper medical care.

At the time of her injury Mrs. Leavell was a guest at Brent House,[4] her husband being a patient at the defendants' hospital. In attempting to arise from her chair in the restaurant, she slipped and fell to the floor. A clinical examination in the emergency room of the Ochsner Foundation Hospital disclosed painful contusion in the area of the right hip and sprain of the right ankle. The x-ray examination revealed no fractures.[5] Because of a shortage of hospital beds, she was allowed to return to Brent House

4. Brent House is a guest house for the Ochsner Foundation Hospital.

5. The x-ray study did confirm the osteoporotic condition of her bones previously disclosed to defendants May 10, 1958, when Mrs. Leavell was treated for fractures of the arm and forearm. Osteoporosis is porosity of the bone. It is an aging process predisposing to fracture.

for the night, entering the hospital the next day, October 24, 1958.

After the examination in the emergency room, in spite of persistent efforts by Mr. Leavell, no doctor saw Mrs. Leavell until noon on October 25th, when she was seen by Dr. Duncan, a staff orthopedist, and Dr. Richards, an orthopedic resident. At that time her hip was put through a full range of motion by Dr. Richards in the presence of Dr. Duncan. Some pain was elicited on quick abduction in the region of the abductor muscles. Otherwise the patient seemed improved. Again a diagnosis of sprain of the right ankle and contusion of the abductor muscles in the right thigh was made. She was told at this time by Dr. Duncan, who had also examined the x-rays taken immediately after her fall, that she needed no further hospitalization, that with bed rest her remaining pain would pass. She left the hospital in an ordinary passenger car for her home in Ocean Springs, Mississippi.

The trip home was a painful one, as were the first few weeks following the accident. She took to bed for over a month, got around in a wheel chair for two months, had a physiotherapist manipulate her leg on five or six occasions, went to Hot Springs, Arkansas, for the baths, and finally, when the pain persisted, six months after her accident she consulted her family physician. X-rays taken at that time disclosed the fracture and further examination disclosed the leg shortage.

Plaintiffs level seven separate charges [6] of negligence and malpractice at the defendants, the most serious of which being the failure, through inadequate x-ray and clinical examination, to diagnose the fracture and failure to retain Mrs. Leavell under continued observation, performing such additional clinical examinations and obtaining such additional x-rays as her course of recovery indicated.

In Louisiana, as the mere reading of the controlling principle implies, a plaintiff in a malpractice case has two strikes against her before the trial begins. In addition to being obliged to prove that the actions of the doctor lack the required degree of skill, she must obtain medical testimony as to what that degree of skill in the community is, as well as proof from other doctors that the physician in suit failed in his duty of care. Understandably, doctors are not anxious to indict fellow practitioners for malpractice. Common survival and mutual protection dictate this lack of interest. This is particularly so where, as here, the accused doctors are eminent in their profession and enjoy an outstanding reputation in the community.

Thus the plaintiffs' case here founders before it begins on the rock of self-interest. All of the doctors [7] in the case, including plaintiffs', testified that the actions of the defendants accord fully with that degree of skill ordinarily employed under similar circumstances by doctors in this area. Indeed, they testified that

6. Plaintiffs articulate these charges as follows:
   (a) The failure to obtain proper positioning of her limb on the initial x-ray film.
   (b) The failure to obtain a proper history of her accident.
   (c) The failure to perform any clinical examination.
   (d) The failure to retain Mrs. Leavell under continued observation, perform additional clinical examinations and obtain additional x-rays.
   (e) The failure to prescribe a course of further treatment or observation for Mrs. Leavell after her discharge from the hospital in the event her symptoms persisted.
   (f) The failure of Dr. Duncan to take any steps in the diagnosis of Mrs. Leavell other than the examination of the x-ray films which admittedly did not reflect proper positioning of the limb.
   (g) The diagnosis, without proper bases therefor, of her injuries as torn or sprained muscles and ligaments.

7. Four well qualified orthopedic surgeons testified, two for plaintiffs and two for defendants.

under the same circumstances they themselves would have done precisely as the defendants did. The fact that the x-rays taken at the time the plaintiff was in the emergency room were not fully rotated so that a complete view[8] of the hip was possible does not impress them. This lack of rotation, it seems, results from the increased pain which manipulation of the leg would have caused, and, since the patient showed improvement on clinical examination two days after the accident, in fact had a full range of motion of her hip, further x-ray studies were unnecessary.

At only one point did it appear that the witness doctors might have acted differently from the defendant doctors. Admittedly, Mrs. Leavell, on leaving the hospital, was not advised to return for further checking or to call her family doctor in the event of continued pain. But, on second thought, all of the doctors testified that even if no such instructions were given, a patient having pain would normally be expected to call a doctor.

██ Thus this court is confronted with a lady whose skeletal structure, to the knowledge of the defendants, is weakened by osteoporosis, who breaks one of the primary bones in her hip joint, and that break is neither discovered nor treated by the orthopedic specialists she retained for this purpose. Yet there is insufficient proof, opinion or otherwise, on which to predicate a recovery for her damages. The result here reached merely proves once again that, under prevailing principles, a doctor, unlike others in more pedestrian occupations, is not required to stand behind his work, that if he uses his best judgment and exercises the customary degree of skill, he is not legally responsible for what happens to his patients.

Judgment for the defendants.

8. Ideally, an x-ray study of the hip should include two views, an AP, or fore and aft view, and a lateral, or side view, the lateral view being taken with the leg positioned so as to provide 90 degrees of rotation. The lateral view here was rotated less than 40 degrees.