Lorraine **FREDERIC**, Widow of Louis R. Genovese, Individually and on Behalf of Her Minor Children, Lorraine Gail Genovese, Joyce Irene Genovese, and Darlene Ann Genovese, Plaintiff,

v.

The **UNITED STATES** of America, Defendant.

Civ. A. No. 13873.

United States District Court
E. D. Louisiana,
New Orleans Division.
Oct. 12, 1965.

Duplantier & Kabacoff, Adrian G. Duplantier, James A. McPherson, New Orleans, La., for plaintiff.

Gene S. Palmisano, Asst. U. S. Atty., Eastern Dist. of Louisiana, for defendant.

AINSWORTH, District Judge:

This action was brought against the United States of America acting through the Veterans Administration by Mrs. Lorraine Frederic, widow of Louis R. Genovese, individually and on behalf of her three minor children, under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 et seq.

Damages are sought by plaintiff for the death of her husband, Louis R. Genovese, which occurred on October 16, 1962 when he committed suicide by jumping from a sixth-floor window of the Veterans Hospital at New Orleans, Louisiana, after having cut the window screen with a pocket knife in his possession. Plaintiff alleges negligence on the part of defendant and its agents in failing to detect suicidal intent of the deceased and in not removing him to the psychiatric ward or taking other measures for his security.

The hospital building is ten stories high; it is a general medical and surgical hospital for United States veterans and has a separate psychiatric service on the ninth floor, consisting of a closed or locked ward and an open ward. Both wards have strong protective screening on the windows, and each ward is normally occupied by approximately twenty patients who are either emotionally or mentally ill. The closed ward is used for patients who become violent or exhibit tendencies of harming themselves or others and is kept under constant supervision with a permanently assigned hospital staff. Patients in the open ward are subject to supervision and observation with a more or less permanently assigned staff; however, they enjoy the freedom of the various hospital facilities, such as the dining room and the canteen, and are allowed to come and go as they choose. Although these patients may be as ill as those in the locked ward, the aspect of their illness is different in that they do not exhibit traits of behavior or personality changes which would alert psychiatrists to the possibility that they were dangerous to themselves or to others. While the surveillance in the open psychiatric ward is not as rigid as that of the locked ward, it is greater than in the other medical or surgical wards.

The medical history of decedent shows that he suffered from ulcerative colitis. He had undergone surgery for this condition prior to being admitted to Veterans Hospital. On January 10, 1962 a colectomy and a revision of the patient's ileostomy were performed by Dr. Mohammad Atik, surgeon, at Veterans Administration Hospital, and the patient was discharged in February of 1962. He was again admitted on May 24, 1962 complaining of "vague abdominal pains, intermittent shortness of breath, swelling of the feet and ankles, dizzy spells, orthopnea and stiffness of the fingers." Various examinations and clinical tests were made. Dr. George A. Adcock, Jr. examined the patient and wrote the following order: "Consult psychiatry in the A. M. Forty-eight year old white male post-operative colectomy for ulcerative colitis. Has lost all interest in caring

for self and exhibits marked intermittent periods of hostility and feelings of persecution. Would you evaluate? Thanks." The consultation was not had, however, as the patient left the hospital three days later against medical advice. A final summary of his May 1962 hospitalization by Dr. Adcock shows, " * * * The pnt was gaining weight and said he was satisfied with the results; however, he appears slightly hostile to the examiner * * * He is very vague to answer questions and appears hostile and somewhat contradictory * * * The initial impression was anxiety reaction, possible underlying psychosis and post-operative status chornic ulcerative colitis * * * He was placed on placebos to determine if organic pain was present. The placebos at times remarkably relieved the pain. The pnt continued to be very careless with his ileostomy and refused to take proper care of it. On 5/27 the pnt demanded to see the physician on call. When the physician had not appeared within two hours the pnt obtained his clothes from home, dressed and stated he was leaving. He refused to discuss the situation with the physician on call or to accept any pain medication. He signed himself out AMA [against medical advice]." The patient was again admitted to the Veterans Hospital on October 3, 1962, complaining of mild pain and a discharge from his rectal stump. He was ambulatory and did not appear to be acutely ill. The admission history shows, "Neuropsychiatric Systems: Negative." Various tests were made in contemplation of possible additional surgery. On October 8, 1962 a routine psychiatric consultation was ordered by Dr. Atik and Dr. Richard S. Cohen, with the notation, "Psychiatric consult. Patient-ulcerative colitis. Past history psychosis. Please evaluate." The request was received by Dr. Richard Stone, staff psychiatrist, but the consultation was not made prior to Genovese's death. However, on October 13, 1962 the patient was presented by a senior medical student to Dr. Henry O. Colomb, psychiatrist and professor of psychiatry at L.S.U. Medical School, in connection with a demonstration form of clinical teaching. Student notes made as a result of this demonstration showed, "Patient presented this A. M. to Dr. Colomb. Diagnosis of anxiety with some degree of depression was arrived at." Three days later, on October 16, 1962, the patient jumped to his death from a bathroom window of the sixth floor of the hospital.

Numerous members of the Veterans Administration Hospital staff and other physicians who had occasion to have contact with the patient by means of examination or observation, including seven medical doctors, one of whom is a psychiatrist, Dr. Henry O. Colomb, testified. It was agreed generally that there are emotional components connected with the disease of ulcerative colitis, and it was the opinion of all seven doctors that the patient had no unusual symptoms, that essentially his emotional make-up was that of a normal patient, that the patient did exhibit signs of a slight depression but that depression is not uncommon, not only with patients suffering from ulcerative colitis, but with any patient contemplating possible surgery. None of these doctors considered the patient to be a suicidal risk, and it was their unanimous opinion that there was no indication that would justify placing the patient in a neuropsychiatric ward. Dr. George A. Adcock, Jr. said that when he had made the notation in the clinical record on May 24, 1962 that the patient had lost all interest in caring for himself, he was referring specifically to the patient's gross neglect in taking care of his ileostomy, and that his purpose in ordering a routine psychiatric consultation was because of underlying psychological problems usually associated with the disease of ulcerative colitis. The purpose of the request by Dr. Atik for such a consultation was the same—the nature of the illness and because some of the patient's complaints were unfounded. Dr. Atik's request was a routine request, definitely not of an emergency nature as the patient did not impress him as being dangerous or self-destructive, and if he had been

so impressed he would have immediately called in a psychiatrist. Requests for consultation at the Veterans Administration Hospital fall into three categories: routine, urgent and emergency. The requests for psychiatric consultations on both admissions were considered routine. Routine requests are answered anywhere from two to three days to as much as several weeks depending on the situation. In the absence of the two staff psychiatrists there are three consultants available for emergencies. Emergency requests are given immediate action. During the period of 1963 and 1964 the average length of time in which consultations in the psychiatric service were answered was 3.2 days, with a spread of from 1 to 12 days. A delay of eight days was not considered an unusual delay.

The nurses who attended Mr. Genovese in October of 1962 considered him to be a cooperative and quiet person, not a potential suicide victim, and not the type of patient who should have been in a psychiatric ward. There were never any prior attempts at suicide by Mr. Genovese, he had never threatened suicide, and had never mentioned the subject to anyone, including his wife and family. Mrs. Genovese and several relatives of the deceased noticed that his disposition was moody and depressed during his last hospitalization compared to his usual former happy and jovial disposition, but none of them were concerned to the extent that they reported their impression of the patient to the hospital staff.

Dr. William Sorum, a psychiatrist licensed to practice by the State of Louisiana and a member of the American Board of Psychiatry, testified as an expert. He was of the opinion from reading the record that Mr. Genovese was depressed and disturbed. He considered certain signposts helpful in detecting suicidal tendencies. Some of these are previous attempts at suicide, a patient's conversation relating to suicide, changes in behavior pattern, a feeling of persecution, vagueness or impulsiveness in actions, depression, loss of weight or loss of appetite, early morning awakening, expressions of hopelessness and any changes in personal habits. He indicated, however, that no one of these symptoms alone would be indicative of suicidal intent. In retrospect he believed that the patient had suicidal tendencies "because he did take his own life." He further commented, "When you're sitting in this vantage point, you can look back and second-guess what could have been done to prevent this, but as to just what action I would have advocated prior to this suicide, I couldn't say at this time."[1]

Dr. Sorum testified that he was not in a position to say whether a delay of eight days between the time of a request and the psychiatric consultation would be an undue delay. In his experience consultations are delayed for various reasons. He felt, however, "in retrospect," the sooner the consultation occurred the better it would be for the patient.

There was nothing in Dr. Sorum's testimony to indicate that defendant had deviated from the standard of care required by the medical profession.

Dr. Edwin S. Shneidman, co-director and founder of the Suicide Prevention Center at Los Angeles, California, clinical professor of psychiatry and psychology of the University of Southern California School of Medicine, a diplomate in clinical psychology and a member of the Board of Directors and Vice President of the American Board of Examiners and Professional Psychologists, testified as an expert in the field of sui-

---

1. Taking the record in its entirety, Dr. Sorum felt that security measures were warranted, but when asked whether the ordinary standard of care would dictate that pending a psychiatric workup a weapon, such as a penknife, should be taken from the patient, he answered, "Oh, I would think so. However, we have used a lot of open ward care with certain types of patients, even if they have depression. I mean, sometimes we take what would be considered, I suppose, calculated risks, and I have at times ordered people to be allowed to retain certain things in their possession because it gives them a sense of identity, of being themselves."

cide prevention. Dr. Shneidman has co-authored, with Dr. Norman Farberow, two texts published by McGraw-Hill entitled "Clues to Suicide" and "The Cry for Help" and is currently writing another text, "Essays in Self-Destruction." He has also written numerous technical articles published by psychiatric and psychological journals. Since 1958 he has been engaged in a special project of the Veterans Administration called the Center for the Study of Unpredicted Deaths, which Center serves all of the Veterans Hospitals in the United States. In connection with this project, all folders on patients who have committed suicide while hospitalized at Veterans Administration Hospitals, along with the next folder in numbered sequence, which is a record of a non-suicide (called a "control folder"), are sent to the central research unit in Los Angeles, for the purpose of analysis and comparison of the two folders in an effort to ascertain the motivating factors of the suicide in question and to attempt to determine if there were any clues of contemplated suicide. The principal purpose of the study is to take a case of suicide out of the realm of unpredicted deaths into the realm of predictable suicides, the results of which are hoped to prevent suicide in many cases. The biggest problem encountered is sudden, unexpected deaths, where there has been no indication that it was about to occur. The procedure is to have an assistant present a case to a panel consisting of Dr. Shneidman, Dr. Farberow and other consultants, giving all pertinent details up to the last few entries in the chart. The panel discusses the case and each member indicates whether he is of the opinion that the case was a suicide or a control folder, and gives reasons for his opinion. A discussion of the clues used in arriving at each opinion is then had. When the procedure was first used in 1958, there was much disagreement in the results. However, through the years the clues or "distilled notions" have been refined and a disagreement is now a rare event. The Suicide Prevention Center receives telephone calls from all over the country from people in distress who are contemplating suicide. Presently it is conducting a research and training institute attended by psychiatrists, psychologists and individuals interested in public health from approximately twenty states. Dr. Shneidman testified that suicide is the tenth leading cause of death and accounts for 0.3% of all deaths in Veterans Administration Hospitals, which is approximately average or a little lower in comparison to other hospitals.

At the request of the government, Dr. Shneidman reviewed the folder of Louis R. Genovese, after having been informed of the patient's suicide. He found evidence of perturbation and anxiety, considered normal concomitants of hospitalization. Had he used the "blind autopsy" procedure he would have assessed this case as non-suicidal. He found lacking the usual conscious or unconscious communication of intention by the patient. The only clues of any significance were not contained in the record but stated by the widow on the witness stand. He referred to the patient's holding on to her and squeezing her hand on the night before his death. However, even if that information had been in the record, in itself it would not have been of deep significance to Dr. Shneidman. When asked about the relationship between a condition of depression and suicide, he stated that depression has classically been related to suicide; if one were limited to one single symptom, the best answer to suicide would be depression, but most depressives are not suicidal and many suicidals are not depressives. It is an overlapping ellipsis, but the two terms are far from being synonymous. The same is true in regard to the relationship between psychotics and suicides. Most psychotics or over 99% of them do not commit suicide. On the other hand, there is an overlap between psychosis and suicide. He detailed some of the signposts found in clinical records of patients who have committed suicide: Previous suicidal attempts, a continuous concern on the part of others of the generally downward

course of the patient, a history of eating and sleeping disturbances and impulsive self-destructve behavior, which behavior might include happenings that wouldn't look like suicide intent, such as accidents, some sort of mutilation, and getting hurt in different ways if supported by other symptoms. It was Dr. Shneidman's opinion that the main thing missing from the Genovese record indicating suicidal tendencies was the wholeness of it and the fact that no one, relatives, doctors or hospital staff sensed that the patient was contemplating suicide. He concluded that the patient should not have been placed in a psyshiatric ward; that no special action on the part of the Veterans Administration Hospital staff was called for; that removing the penknife from the patient or effecting other minimum security measures was not justified.

Dr. William C. Super, psychiatrist, Director of Psychiatry at Charity Hospital since 1955, a staff member of Tulane and L.S.U. Medical Schools and of DePaul Hospital, testified as an expert. He is certified by the American Board of Psychiatry and Neurology and is a fellow in the American Psychiatric Association. He has dealt with several thousand patients in which suicide has been a question. Some of the clues which he considers to evidence suicidal intent are diagnoses of a manic depressive, schizophrenic reaction with depression, alcoholism with depression, language of despondency or hopelessness, preoccupation with death, severe insomnia, lack of appetite, weight loss and previous attempts at suicide. He stated that the whole picture must be viewed for diagnostic purposes. It was his opinion that the evidence was insufficient to indicate that Genovese was a suicidal risk or to warrant removing him to a locked ward. He also felt that inasmuch as Dr. Colomb, a qualified psychiatrist, saw the patient three days prior to his death and found

nothing unusual except a mild depression, the Veterans Administration Hospital had the right to rely on his recommendations. He found that the treatment rendered the patient was equal to the standard of care in the community and that the staff acted according to ordinary medical practice.

Plaintiff alleges negligence in the failure of the hospital personnel to detect Mr. Genovese's suicidal potential and to have taken necessary precautions which would have prevented his self-destruction. It is further contended that defendant was negligent in failing to provide the patient promptly with a psychiatric consultation, which failure contributed to his suicide.

■ The question with which the court is concerned is whether or not defendant or its agent was guilty of negligence which proximately caused the death of plaintiff's husband, or did defendant fail to exercise the proper degree of care under the circumstances.[2] The standard of care required by the medical profession was announced by the Supreme Court of Louisiana in Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1954), in which the court stated:

> "A physician, surgeon, or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case."[3]

2. According to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) the law of the State where the alleged negligent act or omisson occurred, i.e., Louisiana, is the applicable law of the case.

3. This standard of professional care is the law of Louisiana. See Fairley v. Douglas, La.App., Orleans, 76 So.2d 576 (1955); Norton v. Argonaut Insurance Company, La.App., 1 Cir., 144 So.2d 249 (1962);

There is nothing in the record which shows a lack of care and diligence or error of judgment on the part of members of the Veterans Administration Hospital staff. The evidence is overwhelming that the accepted method of procedure was followed by the hospital in its care and treatment of the patient. The patient had not been admitted as a psychiatric patient, had not been classified or diagnosed as such, and there was no evidence that he was in need of such treatment. Therefore, it would have been unwarranted and unreasonable for the hospital to have placed the patient in a psychiatric ward or to have imposed the security measures customarily employed with patients who are violent or dangerous. Plaintiff's argument that Mr. Genovese should have been placed on a lower floor and deprived of his penknife is untenable, for even if these precautions had been taken, nothing would have prevented the patient from walking up to a higher floor or securing another instrument for cutting the screen; all of the patients, with the exception of those in the locked ward, had free access to higher floors and to the canteen where such articles as razors or penknives could have been obtained. The only measure that could have possibly prevented suicide would have been placing the patient in the locked ward reserved for the violent or dangerous. There was no evidence to justify this precaution; to the contrary the testimony of all the doctors and members of the staff at the hospital was to the effect that there was no basis for removing the patient to a psychiatric ward.

It is suggested that there was a breach of duty in the failure of defendant to hold a psychiatric consultation more promptly. The request for this consultation was considered a normal routine request, not urgent, and certainly not an emergency calling for immediate action. The procedure of the staff in this respect was in conformity with the accepted standards of the community and elsewhere. Dr. Colomb, the psychiatrist who interviewed the patient, detected no symptoms that would have justified psychiatric treatment. The hospital staff was not negligent in relying on his observations.

■ Foreseeability of harm is an essential element to actionable negligence. Brown v. Liberty Mutual Insurance Company, 234 La. 860, 101 So.2d 696 (1958). This element is completely lacking here. None of the witnesses suspected or had cause to suspect that the patient might commit suicide or that he was even contemplating such action.

■ Plaintiff has therefore failed to prove that defendant was guilty of any actionable negligence in its treatment of decedent. Accordingly, judgment will be entered for the defendant, dismissing plaintiff's suit.

Favalora v. Aetna Casualty & Surety Company, La.App., 1 Cir., 144 So.2d 544 (1962); George v. Travelers Insurance Company, E.D.La., Baton Rouge Division, 215 F.Supp. 340 (1963); Leavell v. Alton Ochsner Medical Foundation, E.D.La., New Orleans Division, 201 F.Supp. 805 (1962). While there is no Louisiana case announcing the standard of care to be exercised in the treatment of a mental patient, other jurisdictions follow the same general standard of care as stated in Meyer v. St. Paul-Mercury Indemnity Co., supra. See White v. United States, E.D.Va., 205 F.Supp. 662 (1962); Baker v. United States, 8 Cir., 1965, 343 F.2d 222, and Mounds Park Hospital v. Von Eye, 8 Cir., 1957, 245 F.2d 756.