## MOURNET v. SUMNER

(February 15, 1932. Opinion and Decree.)
(March 7, 1932. Rehearing Refused.)

Henry W. Robinson and Henry M. Robinson, of New Orleans, attorneys for plaintiff, appellant.

St. Clair Adams, of New Orleans, attorney for defendant, appellee.

HIGGINS, J. This is a suit for damages by a widower against a dentist on the ground of malpractice, which is said to have caused his wife much unnecessary pain and suffering and resulted in her death.

The petition charges the defendant with being at fault in using unsterile instruments in extracting two teeth in the lower left jaw of the patient; in fracturing her jawbone in the process of pulling the teeth and failing to promptly discover this injury by not having an X-ray picture made; in not removing a portion of the root of the molar tooth that broke off and remained in the socket and a spicule of bone that lodged in the soft tissue of the jaw, resulting from the extraction of the molar tooth; and in failing, through lack of skill, care, and diligence, to discover and properly treat a serious infection, which caused pus to form in the sockets from where the teeth were removed, with the result that osteomyelitis and toxemia set in and caused the patient's death.

The defendant denied liability and that he was at fault, and avers that he treated the patient with diligence, care, and skill, and with the proper methods used by dentists in this locality.

There was judgment in favor of the defendant, dismissing the suit, and plaintiff has appealed.

Our appreciation of the facts of the case, as we gather them from the voluminous record, are as follows:

The deceased was a woman about thirty-two years of age, and, because of ill health sought the advice of her family physician in April of 1929. The doctor found that she was anæmic and placed her on a nourishing diet and certain tonics, for the purpose of building up her body resistance and weight. After a number of visits, she responded favorably to the treatment to a slight degree.

Around April 1, 1930, being in a weak condition and pale looking, she returned to the doctor for further examination. He found that she had been suffering additionally from bronchitis, and continued to treat her for anæmia and the bronchial trouble, but without appreciable success, and, not finding any other focus for the trouble, on or about July 9, 1930, advised her to see a dentist for the purpose of determining if there were any infected teeth. She called upon the defendant, who caused X-ray pictures to be taken of all her teeth by the Tulane Clinic. These skiagraphs showed a considerable amount of bridgework and filled teeth, which work had been previously performed by another dentist. It also appears that there were six abscessed teeth, four in the upper jaw and two in the left lower jaw, consisting of a filled molar tooth and the bicuspid tooth.

On July 14, 1930, defendant extracted the lower left molar tooth, and in doing so administered nitrous oxide as an anæsthetic. The patient reacted very unfavorably to the anæsthetic. In removing the lower left molar, a portion of one of the roots broke off and remained in the socket, as well as a small piece of the jawbone that surrounded the tooth. The defendant discovered that a portion of the root of the tooth had broken off, but did not realize that a fragment of the bone also had done so. He curetted the cavity, and informed his patient that a small portion of the root of the tooth had broken off, but did not attempt to remove it.

Four or five days subsequent thereto he took out the lower left bicuspid tooth, which adjoined the molar tooth previously removed. On this occasion the defendant did not administer the same anæsthetic used in the first operation on account of the patient not receiving it well, but used a local anæsthetic of novocaine by letting it seep into the soft tissue around the tooth, but without injecting it into the gum. After the extraction of the molar tooth, the patient's face became swollen, and the cavity and the region around it were inflamed. This condition became more aggravated when the second tooth was drawn. The defendant treated the patient's mouth with antiseptic washes, syringing and mopping out the cavity with ST-37, sodiphene, metaphene, and stopain. These treatments were administered daily until August 28, 1930.

In the meantime the patient had visited her family doctor on July 22, August 4, August 12, and August 22, 1930. On August 28, 1930, her physician, Dr. Robin, advised that another dentist be called in consultation, because the condition of the jaw, inflammation, swelling, and some pus formation, was not yielding to the treatment administered by the defendant, and was becoming worse. The defendant, when apprised of the physician's opinion, sent the deceased to Dr. Ben Matthews, a dentist, who also does X-ray work in connection with dental cases, for the purpose of having another photograph made of the patient's mouth. Drs. Matthews and Sumner, the defendant, then called upon Dr. Robin and discussed with him this picture. The X-ray was read as showing a small portion of the root of the molar tooth that had broken off still lodged in the socket, with an abscess at the apex of the root and a chipped fracture of the alveolar process, the bone surrounding the tooth, about a sixteenth of an inch thick and approximately one-half inch in length. At that time the patient's mouth was badly swollen and inflamed, but the doctors felt that there was no reason to be alarmed, as she was not running a temperature.

The patient continued her daily visits to defendant's office, where the mopping and syringing of the cavities with antiseptic were continued until about September 4 or 5, when she refused to return. During the above period of treatments the patient was able to walk about, going to and from the doctor's office, and driving her own automobile. From about August 28 to September 8, 1930, the patient expectorated considerable pus, both during the day and at night, and suffered severe pains, and had a swollen condition of the left lower jaw, which caused a protrusion towards the chin and neck.

On September 8, 1930, the patient walked a distance of about four blocks to Dr. Robin's office. The doctor found her to be suffering greatly, and incised the swelling under the chin and drained considerable pus from it. At the same time the lower

front teeth were bulging from the swollen and inflamed gums and the doctor removed one of them with his fingers, because it was so loose. Dr. Robin became alarmed, and ordered the patient to the French Hospital.

On September 9, 1930, at 9 o'clock a. m., her husband drove her in an automobile to the hospital, and she walked into the institution and was immediately placed in bed.

A physical examination of the patient by Interne Staley showed that the patient was a well-developed female of about thirty-two years of age, with no abnormalities, but poorly nourished; that her neck and jaw were greatly swollen, and that she was suffering from severe pain in her jaw and the back of her head; that she vomited a great deal during the day; that there was some evidence of a chest cold, or a fluid in the large bronchi; that the heart was not enlarged, and there were no thrills or murmurs; that her temperature was 101 degrees; and that in other respects she appeared to be normal.

The urinalysis showed that there was considerable pus, red blood corpuscles, and coarse granular and hyalin casts in the urine. The blood test showed 26,250 white corpuscles and coagulation time two minutes and fifty seconds.

X-ray pictures were taken the same day by Doctors Menville and Ane. These pictures were read as showing:

"Unextracted root in bicuspid region, with abscess at apex. Fracture along alveolar margin extending backward to molar region. Some bone absorption along alveolar margin."

The patient spent an uncomfortable night in the hospital, and did not respond very well to the sedatives administered to ease her pain. There was the usual routine preparation for the operation, which was to be performed on September 10, 1930, at 7 a. m.

Dr. Robin had called in consultation Dr. Sidney L. Tiblier, a dental surgeon, who recommended that the patient be placed under a general anæsthetic for the purpose of removing four of the front lower teeth, which had become involved and were protruding, and to make an external incision of the floor of the mouth for the purpose of giving adequate and proper drainage to the infected parts. At 7:15 a. m. the patient was brought into the operating room and ethylene gas administered as an anæsthetic. The patient reacted very badly, becoming blue. She was revived with oxygen and carbon dioxide. During a period of about a half hour, while the anæsthetist was attempting to properly anæsthetize the patient, she turned blue, or cyanosed, three times. In the meantime Dr. Tiblier was able to remove four front teeth with forceps, without much effort, because they were very loose and protruding, due to pus which caused the gums to recede and the teeth to become loose in their sockets. The third time the patient cyanosed she stopped breathing, and for an hour every effort known to medical science was made to revive her without effect, and the patient died on the table.

The attending physician and the dental surgeon provisionally diagnosed the case as osteomyelitis of the lower jaw, a disease which destroys the bone, following the extraction of teeth, and finally diagnosed it as osteomyelitis of the lower jaw following extraction of teeth, toxemia, and fracture of the alveolar process. They certified that in their opinion the patient died primarily from toxemia caused by osteomyelitis of the lower jaw following the

extraction of teeth, aggravated by the anæsthetic.

At this point it may be well for us to inquire into the law covering the case. The suit is brought under the provisions of article 2315 of the Revised Civil Code, as amended by Act No. 159 of 1918, and article 2316 of the Code, which give a right of action to a surviving husband to recover damages for the pain and suffering endured by his deceased wife and her death, which result from another's negligence, carelessness, imprudence, or want of skill.

The general rule with reference to the responsibility of a doctor for malpractice is stated in 30 Cyc., p. 1507, as follows:

"A physician or surgeon undertaking the treatment of a patient is not required to exercise the highest degree of skill possible. He is only required to possess and exercise that degree of skill and learning ordinarily possessed and exercised by the members of his profession in good standing practicing in similar localities and it is his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning and to act according to his best judgment."

This principle of law was approved by our courts in the following cases: Roark et al. v. Peters et al., 2 La. App. 448; Id., 162 La. 111, 110 So. 106; Gouner v. Brosnan et al., 155 La. 1, 98 So. 681; Stern v. Lanng, 106 La. 738, 31 So. 303; Lett v. Smith, 6 La. App. 248; Comeaux v. Miles, 9 La. App. 66, 118 So. 786.

The duty and liability of a dentist to his patient corresponds with that of physicians and surgeons generally. Lett v. Smith, supra; Ruling Case Law, vol. 21, p. 386, verbo "Physicians and Surgeons."

In the case of Gourner v. Brosnan, supra, in determining who bore the burden of

proof in this class of cases, our Supreme Court said:

"The burden is upon the plaintiff to establish by a fair preponderance of the evidence the allegations of his petition charging Dr. Brosnan with 'negligence, carelessness, want of skill and malpractice' in the methods he employed and in the manner he treated plaintiff's wound." See, also, Roark v. Peters, supra.

Justice William Howard Taft, as the organ of the United States Circuit Court of Appeals, in the case of Ewing v. Goode (C. C.) 78 F. 442, 443, used the following language:

"A physician is not a warrantor of cures. If the maxim, 'Res ipsa loquitur,' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' " See, also, Cassingham v. Berry, 67 Okl. 134, 150 P. 139, 168 P. 1020; Ayala v. King-Ryder Lumber Co., 146 La. 536, 83 So. 799; Stern v. Lanng, supra; Lett v. Smith, supra; Nixon v. Pfahler, 279 Pa. 377, 124 A. 130.

The rule is well established that a physician or dentist cannot be held liable for the death of a patient under his treatment, where there is no evidence to show negligence or lack of skill on his part, sufficient to overcome the prima facie case in his favor made by the evidence that the treatment adopted by him was the usual and customary one. The fact that a patient died under such circumstances does not raise any presumption of negligence or lack of skill on his part. Hoover v. Buckman, 194 Ill. App. 308; Edwards v. Uland, 193 Ind. 376, 140 N. E. 546; Moore v. Smith, 215 Ala. 592, 111 So. 918; McGraw v. Kerr, 23 Colo. App. 163, 128 P. 870;

King v. Belmore, 248 Mass. 108, 142 N. E. 911; Loudon v. Scott, 58 Mont. 645, 194 P. 488, 12 A. L. R. 1487; Hoffman v. Watkins, 78 Wash. 118, 138 P. 664; Miller v. Toles, 183 Mich. 252, 150 N. W. 118, L. R. A. 1915C, 595; Woodlawn Infirmary v. Byers, 216 Ala. 210, 112 So. 831; Beckwith v. Boynton, 235 Ill. App. 469; Wilt v. McCallum, 214 Mo. App. 321, 253 S. W. 156; Niebel v. Winslow, 88 N. J. Law, 191, 95 A. 995; Kuehnemann v. Boyd, 193 Wis. 588, 214 N. W. 326, 215 N. W. 455; McCoy v. Buck, 87 Ind. App. 433, 157 N. E. 456, 160 N. E. 46; Nixon v. Pfahler, supra; Blodgett v. Nevius, 189 Ill. App. 544; Wilkins v. Ferrell, 10 Tex. Civ. App. 231, 30 S. W. 450.

It has also been held that, in order for a plaintiff to succeed, it is not sufficient to make his case probable, but he must prove it with reasonable certainty. Furlow v. Maison Blanche Co., Ltd., 2 La. App. 351; Roche v. Hotel Grunewald Co., 7 Orleans App. 65; Giarruso v. N. O. Ry. & Lt. Co., 131 La. 559, 59 So. 979; Adams v. Germaine & Boyd Lumber Co., 130 La. 920, 58 So. 815.

Turning our attention again to the record, which consists in the main of medical testimony, we will first take up the charge that the forceps and the instruments used in pulling the patient's teeth were contaminated. The only evidence in the record on this point is the testimony of the defendant and his assistant. They both state that the instruments were first put in boiling water, after they had been used in a previous case, and placed on aseptic gauze in the cabinet, where they remained until they were to be used again. Immediately preceding the use of these instruments on another patient, they were dipped in a sterilizing chemical solution, and placed upon a freshly laundered towel on the dentist's table. Counsel for plaintiff strenuously contends that, as the towel from the laundry was not sterile due to the fact that it was handled by those employed by the laundry, the placing of the instruments upon it had the effect of causing them to become unsterile. Dr. Charles Duval, pathologist expert, witness for the defendant, on cross-examination testified that, in his opinion, the instruments would lose their proper sterilization by being placed upon any portion of the towel that had come in touch with the human hand, but that, if they were placed upon any other portion of the towel, the instruments would remain sterile. He further stated that it might be dangerous to follow such a practice in a dental office.

Drs. Jacob A. Gorman, Joseph M. Woodward, Herman B. Gessner, and Charles Duval, however, pointed out that it was impossible to obtain perfect sterilization in any case, especially in dental work, because the oral cavity is filled with millions of germs, and the mere breathing of the patient would cause the instruments, when placed in the mouth, to become contaminated. In any event, the plaintiff has failed to show causal connection between any infection that the instruments might have carried into the jaw and the subsequent pain, suffering, and death of the plaintiff's wife. This is particularly true in the light of the testimony that the deceased had six abscessed and diseased teeth in her mouth before she went to the dentist and had been in an anæmic condition for more than a year preceding her first visit to his office.

On the second issue, the evidence is clear that the jawbone was not fractured in the sense that the bone was broken in two, but there was a fracture of that portion of the bone known as the alveolar process, which surrounds the teeth. There was a chipped

fracture of this portion of the bone, leaving a sliver of bone very nearly a half-inch in length imbedded in the tissues of the gum. All of the doctors agree that in extracting a tooth, particularly a molar, where the roots extend to a greater circumference than the opening in the alveolar process, when the roots pass through this opening of the bone, neither being flexible, either the bone or the roots of the tooth must quite often be broken.

The evidence shows that the defendant did not discover the fracture until August 28, 1930, when the X-ray picture was made by Dr. Matthews, but he says that he felt that there might be some small fragments of bone, because that was the common experience in cases of that kind. The preponderance of the evidence of the experts shows that it is not the practice to make X-ray pictures after a tooth is extracted, because these small portions of bone become exfoliated, and, by natural process, are eventually discharged from the gums.

As to the third alleged ground of liability, there is some difference of opinion among the dentists and the physicians and the pathologist as to whether or not the piece of bone and the portion of the root of the tooth should have been removed at the time the tooth was extracted.

All of the experts agree that, where there is an infected area, it is the standard and accepted practice not to disturb it by doing further surgical work in that area, because the infection would thereby be spread to a greater extent; the exception being where the involved parts will not yield to treatment because the drainage is inadequate and the patient's condition becomes more aggravated and alarming.

Sidney L. Tiblier, dental surgeon, and Charles S. Tuller, dental surgeon, plaintiff's witnesses, both testified that in their opinion, when the swelling and inflammation did not subside and there was no response to the antiseptic treatment, radical surgical interference should have been resorted to by the patient being placed under a general anæsthetic, and the portions of bone and root of the tooth removed, particularly since there was an abscess at the apex of the root of the tooth, before the molar was extracted. But on cross-examination both of these experts admit that their opinions are based upon what an experienced dental surgeon would have done in such a case, and not what an ordinary dentist, in this locality, would have done.

Jacob A. Gorman and Joseph M. Woodward, dental surgeons, Ben B. Matthews, dentist, and Herman B. Gessner, physician and surgeon and former dentist, witnesses for the defendant, were of the opinion that, since the X-ray picture taken by Dr. Matthews on August 28, 1930, did not show any grave condition as to bone necrosis, or osteomyelitis, and as the patient was free from fever, Dr. Sumner, the defendant, was justified in continuing the local treatment, and that his conduct in so doing was in keeping with the usual and accepted method of practicing dentistry in this locality.

Dr. Sumner testified that he did not attempt to remove the portion of the root of the tooth because the patient had previously reacted so unfavorably under the anæsthetic of nitrous oxide; that, under those conditions, it would have been exceedingly dangerous to attempt to continue the operation; that in his practice of thirty years, in which he had extracted over one hundred thousand teeth, it was his experience that small portions of roots of teeth in such cases were eliminated by natural processes, being shoved to the surface of the gum, where they could be easily removed. This, he says, is also true of the splintered portion of the alveolar

process, or bone, which is absorbed by natural processes and sometimes discharged through the gum. His testimony in this respect is corroborated by the above experts, who testified in his behalf.

We are of the opinion that plaintiff has failed to establish that defendant was guilty of lack of skill in not removing the root of the tooth and the fragment of bone under the circumstances.

Finally, plaintiff contends that the defendant, Dr. Sumner, through lack of care, diligence, and skill, failed to recognize that the patient had developed a serious disease, osteomyelitis, which attacks the medulla, or inner or soft tissue of the bone, and then spreads to the hard, bony part, causing necrosis or degeneration of the bone, and, having failed to properly diagnose the case, he did not apply the proper remedy, and, therefore, the patient developed toxemia as a result of the osteomyelitis, which caused her death.

The evidence is conflicting as to whether or not the patient suffered from osteomyelitis and that her death was caused thereby. Drs. Tiblier, Robin, and Tuller were of the opinion that the patient was suffering from such a malady, and that it was the primary cause of her death. Drs. Duval, Gorman, Woodward, Gessner, Matthews, Menville, Ane, and the defendant, were of the opinion that the deceased was not afflicted with osteomyelitis. Drs. Duval, Woodward, Gessner, and Matthews were of the opinion that she died as a result of the anæsthetic. The record discloses that, as a whole the experts who testified for the defendant had superior training and greater experience than those who testified for the plaintiff, and, as they were in the majority, as far as numbers are concerned, it would appear that the defendant, to say the least, successfully rebutted the plaintiff's evidence tending to show negligence and lack of skill on defendant's part, and that the lady's death was caused through the defendant's improper treatment.

Furthermore, all the evidence shows that, while the X-ray picture will not reveal osteomyelitis in its incipient state, it will plainly do so in its advanced stage, because the bone is destroyed by necrosis. Now it is clear that the X-ray picture taken on August 28, 1930, by Dr. Matthews, and those taken by Drs. Ane and Menville on September 9, 1930, do not show destruction of the bone, as would be the case if the patient had suffered from osteomyelitis. As we have already said, the testimony of the experts for defendant confirmed Dr. Sumner that the treatment he administered was in keeping with the accepted practice of dentists in this locality. Defendant also successfully showed that the toxic condition of the patient might be the result of the abscesses at the roots of her teeth, which condition prevailed before the deceased had called upon the defendant for treatment. The evidence on this point was convincing, because it was pointed out that the patient had been in an anæmic condition for about eighteen months before she was treated by the defendant, and that the anæmia did not respond to the treatment of her family physician, within a period of at least one year.

A very careful reading of the record and the splendidly prepared briefs by able counsel of both parties leave us with the conviction that the deceased's pain and suffering and subsequent death were not the result of the defendant's negligence, carelessness, imprudence, or lack of skill, either primarily or contributorily.

For the reasons assigned, the judgment is affirmed.