156 So.2d 313 (1963)
William H. LINDSEY
v.
MICHIGAN MUTUAL LIABILITY CO. and Dr. Malter A. Salatich.
No. 1105.
Court of Appeal of Louisiana, Fourth Circuit.
July 1, 1963.
Rehearing Denied October 2, 1963.
Certiorari Refused December 16, 1963.
*314 Bentley G. Byrnes, New Orleans, for plaintiff-appellant.
Adams & Reese, Henry B. Alsobrook, Jr., New Orleans, for defendants-appellees.
Before REGAN, YARRUT and HALL, JJ.
REGAN, Judge.
Plaintiff, William Lindsey, instituted this suit against the defendants, Hotel Dieu, its liability insurer, Michigan Mutual Liability Company, and Dr. Malter Salatich,[1] endeavoring to recover the sum of $106,374.53, representing personal injuries and medical expenses which he incurred as a result of the combined negligence of Dr. Manuela Cortez, a Hotel Dieu intern, and Dr. Salatich in failing to employ the use of an X-ray as a medium to discover a fishbone which penetrated the epidermis and became embedded in his left foot, and that this omission, which occurred in the course of their treatment of him, constituted malpractice.
The defendants answered and denied the existence of any negligence on their part. In explanation thereof they asserted that the taking of an X-ray picture of plaintiff's foot, by a radiologist, was not a prerequisite of proper medical treatment in this instance since most fishbones are translucent and, therefore, would not appear in a picture obtained through the medium of an X-ray.
*315 In the alternative, the hospital's insurer denied liability for its intern's treatment in the event that it was considered to be negligent.
A trial by jury occurred in the lower court which resulted in a verdict for the defendants, and in conformity therewith, the trial judge dismissed plaintiff's suit. From this judgment, plaintiff has prosecuted this appeal.
The factual issues involved in the treatment of the plaintiff are, as usual, disputed; however, the evidence preponderates in favor of the following revelation thereof:
On July 18, 1959, plaintiff stepped on a fishbone which penetrated the ball of his left foot and when he endeavored to remove the bone, it broke and a portion thereof remained in his foot. On the following day, since he had no private physician, he sought emergency treatment from the facilities provided by Hotel Dieu.
He was treated by Dr. Manuela Cortez, an intern who was assigned to the emergency room when the plaintiff was admitted therein. She made an incision in the ball of his foot near the wound to probe for the remainder of the bone; however, she was unable to find it. Thereafter, she sutured the incision, administered penicillin and instructed plaintiff to have the stitches removed by Dr. Salatich after five days had elapsed. Plaintiff was referred to this private physician, who was on the staff of Hotel Dieu, by Dr. Cortez because the hospital's policy did not permit additional treatment of emergency cases by interns unless special circumstances required it.
In a deposition obtained from Dr. Cortez, who no longer resides in this state, she expressed the opinion that an X-ray would have been useless as a diagnostic aid in plaintiff's case because a fishbone, translucent generally, would not appear in a picture obtained through the medium thereof.
Two days after the emergency treatment, plaintiff's foot became infected and he then contacted Dr. Salatich, who visited him in his home. This physician removed the sutures, prescribed antibiotics to alleviate the infection and suggested the use of compresses to reduce the swelling. Dr. Salatich observed that the infection was extremely acute and, therefore, suspected that the plaintiff may have been suffering from diabetes, since the injury which he had incurred, generally, would not cause such a severe infection.
He also instructed the plaintiff to submit the usual specimen for analysis in order to determine whether he was a diabetic. Plaintiff never complied with this request.
Three days later, Dr. Salatich again visited plaintiff in his home. An examination of his foot revealed that the infection had subsided to some extent; however, he advised plaintiff to continue the use of the antibiotics.
On July 28, 1959, plaintiff visited the offices of Dr. Salatich and although he found that the foot had improved, he instructed the plaintiff to return the following week for an X-ray; however, he failed to visit Dr. Salatich until September 2, 1959, more than a month later. The wound had healed but the plaintiff still complained of pain. Dr. Salatich then advised him to return on September 8, 1959, at an earlier hour so that he could have an X-ray made. On both of these occasions, the plaintiff was seen at 5 p. m., and the radiologist's office was closed. Dr. Salatich again advised him to have an X-ray made.
Dr. Salatich did not see the plaintiff until four months later which visit occurred on January 8, 1960. He then referred him to Dr. Joe V. Hopkins, a radiologist, who X-rayed his foot.
The negative disclosed that a fishbone was lodged in the ball thereof near the great toe. Dr. Salatich then arranged to surgically remove the bone on January 12, 1960. The day before the operation was scheduled, plaintiff changed doctors.
On January 12, 1960, plaintiff consulted Dr. James LeNoir, an orthopedic surgeon, *316 who X-rayed plaintiff's foot to ascertain the location of the fishbone. On January 28, 1960, Dr. LeNoir removed the fishbone, which, at that time, was encased in a puslike fluid.
Dr. Salatich explained that he did not X-ray plaintiff's foot during the July visits because the infection was so acute that surgery was impossible. He explained that there was a danger that the infection would spread to the bones and joints nearby if he had operated then.
The only question which this appeal has posed for our consideration is whether the failure to X-ray plaintiff's foot constituted negligence.
Our jurisprudence does not require a physician to exercise the highest degree of care or skill possible in treating a patient. Nor does it impute negligence to the physician who fails to follow that course of treatment which, at a later date, may be proved to be the wiser course. The physician is only responsible for exercising his best judgment and administering reasonable care. Whether he has complied with that degree of care required in treating a patient is measured by the skill ordinarily employed by the members of his profession in good standing in his community in treating the same complaint or injury.[2]
Seven doctors appeared to testify, and with respect to the actions of Dr. Cortez, they were generally of the opinion that her treatment of plaintiff fell well within the standards of good medical practice. Several were of the opinion that an X-ray would not have disclosed the presence of a fishbone when the plaintiff received emergency treatment in the Hotel Dieu, even though an X-ray picture did ultimately reveal the existence of a fishbone. This reasoning is based on the probability that the fishbone calcified during the six month interval which transformed it from a translucent to an opaque object thus making it possible for the bone to then appear in a shadow picture made with X-rays. The doctors further opined that it was difficult to find a fishbone by a probing operation. Dr. Salatich pointed out the existence of medical authority which recognized that the use of the X-ray to discover the presence of a fishbone embedded in the flesh is a useless gesture considering the translucent characteristic thereof.
In view of what we have related hereinabove, we are of the opinion that Dr. Cortez's treatment of the plaintiff was well within the standards prescribed by competent doctors within this community, and there is no proof that she was guilty of any negligence whatsoever.
Turning our attention to the plaintiff's complaint that Dr. Salatich was negligent, we are also convinced that this assertion is without merit. It appears to us that the failure of plaintiff to obtain an X-ray when the infection became acute resulted from neglecting to comply with his physician's advice.
The evidence preponderates to the effect that Dr. Salatich's treatment was approximately the same as that which would have been accorded by other competent medical men in this community in keeping with good medical practice.
Plaintiff's complaints with respect to Dr. Salatich's negligence actually turn on a question of credibility, since the plaintiff's and the doctor's versions of the prescribed treatment are, for all practical purposes, irreconcilable. The jury very obviously discounted the plaintiff's contention to the effect that he insisted upon an X-ray, but that Dr. Salatich withheld it. This conclusion by the jury is fully substantiated by the evidence inscribed in the record.
On appeal, plaintiff filed a motion to remand this case in order to permit him to introduce newly discovered evidence, which is to the effect that Dr. Cortez, who *317 is a graduate of a medical school located in Mexico, did not possess a license to practice in Louisiana when she treated the plaintiff. This newly discovered fact does not justify a remand hereof, since all of the doctors explained that a graduate of a medical school is a doctor of medicine when the degree is conferred. Louisiana law permits graduates of medical schools, which are located outside of the state, to practice as an intern in a hospital without initially being licensed by the state. The record reveals that interns are considered to be competent by the medical profession to perform minor surgery, and the probing operation which was performed by Dr. Cortez falls within that category.
Therefore, the motion to remand is denied.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
NOTES
[1] Pending this appeal, Dr. Malter Salatich died as the result of an airplane accident. His executor has been substituted as a party defendant.
[2] Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1954).