McBRIDE, Judge.
This court is confronted with two medical malpractice suits which had been consolidated by the trial court for the purposes of trial; after a trial on the merits the suits were dismissed by a separate judgment in each, from which plaintiff has taken the present appeals.
Edgar M. Stern, Jr., died on April 19, 1963, as an aftermath of an abdominal operation performed three days previously. The decedent’s widow, Mrs. Evelyn O. Stern, individually on her own behalf and as administratrix of the estate of her minor child, Belinda Ann Stern, is plaintiff in both suits claiming a large amount of damages against the respective defendants. In the first suit (our docket No. 2667) the surgeon who performed the operation, Dr. Frederick F. Boyce, and his professional liability insurer are made defendants in solido; in the second suit (our docket No. 2668) the defendant before us is Dr. Edward J. Joubert, who assisted Dr. Boyce in the operation.
It is alleged Dr. Boyce was negligent during the course of the operation in that he failed to avoid injury to the patient’s spleen and liver and failed to take appropriate measures to prevent the death of the patient, generally doing acts which by the ordinary standards of care of his profession he should not have done, and generally failing to render proper treatment according to the ordinary standards of his profession. Dr. Joubert in the second suit is charged with having negligently held and manipulated a retractor (an instrument used for the purpose of holding the incision open) causing injury to the patient’s spleen and liver which negligence contributed to the patient’s subsequent death.
Edgar M. Stern, Jr., 35 years old, had been experiencing abdominal pain for a period of more than 16 years. In 1950 he was admitted to the Veterans Hospital. There his condition was first diagnosed as a duodenal ulcer. Upon psychiatric examination the diagnosis was that the pains were of psychogenic origin. It appears that the patient refused to submit to psychiatric treatment and was discharged from the hospital for that reason. No treatment whatever seems to have been administered.
*320 In March, 1961, Stern, suffering abdominal pain, was sent to Mercy Hospital where he remained about a week. The diagnosis was hyperacidity and an ulcer of the duodenum and conservative treatment was accorded the patient who was discharged from the hospital as “improved”.
The next thing the record shows with reference to Stern’s medical history is that he placed himself under the care of Dr. Povilas Vitenas, a general practitioner, about December 21, 1962, with the same complaints, and was treated conservatively with diet; on March 31, 1963, Dr. Vitenas decided that conservative treatment was not helping the patient and had him admitted to Mercy Hospital for examination. Dr. Vitenas had previously seen Stern when he was hospitalized in 1961, at which time Dr. Vitenas was an interne at Mercy Hospital. Stern’s ailment was diagnosed as duodenal ulcer and after further conservative treatment proved ineffectual he underwent the upper abdominal operation known as a gastrectomy and vagotomy at the hands of Dr. Frederick F. Boyce on April 16, 1963. He died about 68 hours thereafter. The autopsy report states that the primary cause of death was bilateral bronchial pneumonia.
The decision to operate came after Dr. Philip Johnson, a specialist in internal medicine, had been called for consultation; Dr. Johnson’s diagnosis was that the patient’s difficulty was caused by an ulcer and he instituted his own conservative treatment consisting of drugs and diet. This went on from April 6 to April 13, 1963, but proved unsuccessful and the patient’s condition grew progressively worse. Upon Dr. Johnson’s recommendation, Dr. Vitenas summoned Dr. Boyce, surgeon, for consultation.
Together the three doctors, after Dr. Boyce had examined the patient, studied his history and checked the numerous tests which had theretofore been made and those he had himself ordered, diagnosed the condition as a duodenal ulcer. Dr. Boyce concluded that the patient should undergo surgery. Dr. Vitenas, who remained in charge of the patient, discussed the prospective operation with him, explaining the mortality and morbidity and the risks involved. The patient consented to the operation, stating that he desired to leave the hospital only when cured.
The voluminous record is composed mainly of testimony given by the 14 physicians who appeared as witnesses, all of whom are experienced and eminent members of the medical profession in their various fields of specialty. They were called upon to give opinions on every aspect of the diagnosis, the operation, the post-operative treatment of the patient, and the autopsy.
Counsel for appellant argues that had Dr. Boyce examined the patient’s record in Veterans Hospital the contents thereof would have been “enough to create misgivings about surgery” and “ * * * the least it would suggest would be to call for a psychiatric consultation and/or perform an additional GI series X-rays.”
The testimony of the surgeons, both fact and expert witnesses, was to the effect that it was not necessary, under the standards of proper care prevailing in the New Orleans medical community in a case of this type, to review hospital records which were so remote as 13 years because they would have been of little value in a current diagnosis.
Appellant’s counsel also contends that the patient did not have an ulcer at the time the recommendation for surgery was made and the inference is that the diagnosis was incorrect and the ill-fated operation wholly unnecessary. This argument is premised on the circumstance that the pathologist who examined the portion of stomach removed by Dr. Boyce found no evidence of the presence of an ulcer. The medical testimony reflects the sub-total gastrectomy envisions removal of the lower part of the stomach. The duodenum is cut away from the lower end of the stomach and tied and sutured *321 with the end inverted inward. Then the lower part of the stomach is cut away and the remaining part is sutured onto the jejunum, the portion of the small intestine adjoining the duodenum. The tied-off end of the duodenum is therefore bypassed by the food and secretions from the stomach, which, due to the diversion, pass directly into the jejunum and down the alimentary tract. The duodenum, relieved of the passage of acid from the stomach by the bypass, is allowed to heal and there are no recurring ulcers if the operation is successful. The acid formed by the stomach is reduced due to the removal of a portion of the acid producing surfaces and this, in addition to the diversion of the flow from the stomach directly into the jejunum, helps in preventing recurrence of the ulcer condition.
It thus readily appears why no ulcer was present in the specimen of stomach submitted for analysis. Dr. Boyce testified an ulcerous condition did exist in the patient’s duodenum:
“On exploration in the region of the pyloral duodenal junction an area of scarring was seen which suggested ulceration.”
The testimony of the experts convinces us that the decision to operate was proper and was well within the standards of care observed by surgeons in this area, and there was no negligence whatsoever with respect to the diagnosis and in the recommendation of surgery.
With regard to the surgical procedures employed, plaintiff complains about the removal *of the spleen, the extension of the abdominal incision into the thoracic cavity in connection therewith, a hematoma of the liver, and the removal, with the spleen, of a small portion of the tail of the pancreas.
Dr. Boyce testified that he proceeded to perform the vagotomy first and was in the act of mobilizing the esophagus when the patient “heaved” or exerted a coughing or straining type of movement. This disarranged the packing in the operative field and' Dr. Boyce said that he was rearranging this packing when he noticed a bleeding of the spleen which is located under the left rib cage below the retractor which Dr. Joubert had been holding. Between the edge of this retractor and the spleen itself were two layers of the gauze packing. There was a “stocking” net on the retractor. The uncontradicted testimony is that when the spleen is lacerated in any way, it cannot be sutured due to its extremely delicate consistency and, therefore, it must be removed surgically. Because of the patient’s peculiar stocky build his spleen was located high up against the diaphragm and the original incision had to be extended four inches across the chest to afford access to the spleen. The testimony of all the surgeons, including Dr. Canale, plaintiff’s witness, and the pathologist, Dr. Davis, was to the effect the spleen is a fragile organ. It is not directly in the operative field in a case of this kind, but it is so susceptible to injury that it may be torn or lacerated without even being touched by any movement of or traction on adjacent organs. It seems to us that consideration must be given to the fact that there was gauze packing between the retractor and the spleen and also a stocking net on the instrument, which would do much to repel the thought that the retractor lacerated the spleen. The testimony points up the fact that the spleen may be injured during an operation performed by a most skillful surgeon. Dr. Canale testified that the percentage of splenic injury, particularly during a vagotomy, lies somewhere between 2% and 11%. Dr. Becker said he himself had injured about 12 spleens during similar operations notwithstanding his exercise of extreme caution. Dr. Canale when asked whether the spleen may be injured despite the fact that proper care and the maximum of caution is used in the operation answered, “without question.” Dr. Boyce testified that he saw no actual injury to the spleen *322 and in recounting the steps in the operation stated he could not say what caused the organ to bleed, the patient’s “heave” could have been the cause. Dr. Canale agreed. The testimony shows that the extension of the incision into the thoracic area to facilitate the removal of the spleen might have contributed materially to the ensuing pneumonia suffered by the patient, but there is nothing in the record to show that the surgeon or his assistant was guilty of negligence; Dr. Vitenas, who witnessed the operation, corroborated Dr. Boyce and Dr. Joubert that it was carefully and correctly performed. The spleen had to be removed. It is an organ whose function is poorly understood and all the surgeons and Dr. Dunlap, pathologist, testified that the spleen is an unnecessary part of the human anatomy.
The complaint regarding the removal of a part of the pancreas must now come in for discussion. The spleen, as well as the portion of the stomach which had been removed, was sent to the laboratory for tissue analysis, which is a required part of hospital procedure. Dr. Davis, the pathologist, stated he noticed attached to the spleen a particle of a whitish substance which, upon microscopic examination, proved to be a tiny piece of the pancreas. Appellant’s position is that because the pancreas was cut there must have been negligence or a lack of skill on the part of the surgeon and that the damaged pancreas caused or contributed to the death.
Dr. Davis sets at rest the question of negligence in the removal of the small portion of the pancreas. His testimony shows that a portion of the spleen grows along the blood vessels and in cutting them to remove the spleen, a small piece of the tail of the pancreas must be taken out along with the spleen. Moreover, there is nothing going to show that the severing of the small particle of the pancreas had one whit to do with Stern’s death.
The autopsy performed by Dr. Bacher revealed a hematoma of the left lobe of the liver which, when pressed, exuded some blood. The plaintiff’s position is that Dr. Boyce’s negligence caused the condition. From the testimony of the surgeons and the pathologists it is quite apparent that in upper' abdominal surgery it is entirely possible, even under the most careful handling, that due to the pressure exerted in mobilizing the left lobe of the liver a disturbance in blood circulation in the capsule of the liver might occur which may cause some blood to collect under the surface of the liver resulting in‘a hematoma. It is not shown there was any causal connection between the hematoma and the death.
We now quote a portion of the written reasons for judgment handed down by the trial judge which we approve and adopt as part of this opinion:
“The final aspect of this case deals with the post-operative care given Mr. Stern. There seems to be no question that the initial post-operative instructions fof the care of Mr. Stern, which were left by Dr. Boyce, were proper. The only substantial criticism made of the ‘ post-operative care given to Mr. Stern is that Dr. Boyce failed to order a chest X-ray at some point after the operation and before the death. It is argued that by this means the pneumonia from which Mr. Stern died could have been discovered, and treatment instituted which might have saved his life. The nurse’s notes and temperature chart show that Mr. Stern’s temperature, pulse and respiration remained fairly static until noon on the eighteenth, at which time his temperature rose to 102.8°. He was given an alcohol rub for the rise in temperature at about that time, and his temperature had fallen to 102.4°, and he was resting quietly by three o’clock in the afternoon. He was seen by both Dr. Boyce and Dr. Vitenas at some time between then and 6:00 p. m. From about six o’clock on the evening of the eighteenth until three o’clock on the morning of the nineteenth, his temperature contin- *323 tied to rise without too much change in his pulse rate or respiration. At 3:00 a. m., his temperature rectally was 105.2°. He was given an alcohol sponge bath and a tap water flush to lower his temperature. By four o’clock, his temperature had dropped to 104.2° rectal, which is a degree above oral temperature. At 4:30 a. m., he was quieter. At 5:00 a. m., he stopped breathing and was pronounced dead.
“Both Dr. Boyce and Dr. Vitenas testified that there was nothing about Mr. Stern’s condition to indicate any necessity for an X-ray until six o’clock on the evening of the eighteenth. They stated that stethoscopic examination of the chest did not reveal evidence of lung collapse, or difficulty with breathing, or any other indications of pneumonia.
“Dr. Canale testified that, as a matter of practice, he would have taken an X-ray at twenty-four hours after the operation, and that this was standard practice among thoracic surgeons, although he was unable to state that it was standard practice among general surgeons. He further stated that he thought that the pattern of temperature, respiration and pulse rate shown on the chart indicated some pulmonary complications by noon on the eighteenth.
“Dr. John Seabury, a board certified internist, testified that if he had known of the rise in temperature, pulse and respiration that took place at noon on the eighteenth, he would have wanted a chest X-ray at that time. He also felt that it was likely, in view of the autopsy finding, that the X-ray would have shown the presence of pneumonia at noon on the eighteenth. Dr. Boyce testified that, when he saw Mr. Stern at about 6:00 p. m., on the eighteenth, his temperature, pulse and respiration had fallen from the level at noon, and that he saw no cause for alarm at that time, and felt that there was no indication that an X-ray was necessary.
“Dr. Claude Craighead, a board qualified surgeon, testified on direct examination that he felt that not taking an X-ray at noon on the eighteenth was not negligent and was within the standard of care prevalent in New Orleans. He testified on cross-examination that he did not think that there was any cause for alarm in this case until eleven o’clock on the night of the eighteenth, when the first marked rise in temperature took place. He said that if, in addition to the chart and nurse’s notes, he had a suspicion that ‘something was going on’ in the lungs, he was not sure if he would order an X-ray or not under the circumstances in this case.
“Dr. Walter Becker, a board qualified surgeon, testified that the taking of an X-ray is a matter of judgment, and that most patients three days post-operatively have not had X-rays. He testified that, from the record in the case, there was nothing to justify the taking of an X-ray as of noon on the eighteenth. Dr. Joubert testified that he would have ordered an X-ray at seventy-two hours in this case. Dr. Boyce testified that it was his intention to order an X-'ray at seventy-two hours.
“None of the doctors who testified were sure that anything could have been done to save Mr. Stern’s life if an X-ray had been taken at noon on the eighteenth, and if it had shown any pneumonic changes. There was a difference of opinion as to whether or not such changes would have shown on the X-ray, had it been taken. Virtually everyone who was asked the question felt that Mr. Stern was beyond help by 11:00 p. m. on the eighteenth.
“The only other testimony which relates to the possible presence of pneumonia was that of Miss Murlyn Rome, who administered the anesthesia at the operation, who testified in rebuttal that on the morning of the second day post-operatively, at 7:00 a. m., she talked to Dr. *324 Boyce, and he told her at that time that Mr. Stern' had pneumonia. Dr. Boyce denied ever having made such a statement. In addition, Dr. Boyce stated that he told lilrs. Stern at oné o’clock on the afternoon of the eighteenth, that Mr. Stern’s attitude would have to get better and he would have to cooperate more if he was to survive. • He stated that he told her this because Stern was not a good patient, and that he was not cooperating. Dr. Boyce further testified that, if there had been an X-ray taken between twelve noon and 6:00 p. m., on the eighteenth, and if pneumonia had been disclosed thereby, he would not have done anything differently. The post-operative instructions and nurses’ notes show that Mr. Stern regularly received dichrysticin, which is a standard antibiotic used to prevent infection post-operatively.
* ‡ ‡ ‡ % %
“I believe that the testimony in this case is clear to the effect that the decision to make amjX-ray at any point after an operation is one which is left up to the judgment ¿f . the treating physician. There are no rules or regulations, and no. standard of practice as to how long after an operation an X-ray should be made, if ever. In this case, for instance, Drs. Boyce, Vitenas, Joubert and Becker were of the opinion that an X-ray was not necessary. Dr. Craighead was not sure. Dr. Canale testified that he could not say that failure to obtain an X-ray was a departure from the standard of care required in a case such as this, but he felt that most doctors would have made such an X-ray, and he felt that the chart called for an X-ray. Dr. Seabury testified that he would have taken an X-ray if he were faced with the chart and the situation.
“I might point out that all of the doctors who testified in this- case appear to be exceptionally well qualified professionally. The fact that differences of opinion can exist among a group of men as well qualified as these serves only to emphasize that medicine is not yet an exact science. I believe that it has been shown by a preponderance of the evidence in this case that the failure to order an X-ray, if in fact is an error, is an error of judgment and does not constitute negligence or a deviation below the standard of care which should be exercised by a physician in this area. It must be kept in mind that this death did not occur because of the failure-to take an X-ray, or because of the post-operative care given by Dr. Boyce. No one' testified that, the postoperative regimen which he prescribed was anything but proper, and Dr. Canale testified that his routine would have differed from Dr. Boyce’s only in the taking of an X-ray at twenty-four hours post-operatively. * - * * »
Dr. Boyce is among the leading surgeons of this community. He was variously described “without a peer,” as a man with a “international reputation,” etc. Dr. Canale stated: “I have the utmost admiration for him and I would model myself after him. I think he is a great surgeon.” In view of the testimony in the record no one could doubt Dr. Boyce’s skill, learning, competency and his high standing in medical and surgical circles.
It is incumbent on the physician or surgeon who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying that skill tp the given case he used reasonable care and diligence along with his best judgment. Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781.
In Mournet v. Sumner, 19 La.App. 346, 139 So. 728, our predecessors said:
“The rule is. well established that a physician or dentist cannot be held liable for the death of a patient under his treatment, where there is no evidence to show negligence or lack of skill on his part, sufficient to overcome the prima facie *325 case in his favor made by the evidence that the treatment adopted by him was the usual and customary one. The fact that a patient died under such circumstances does not raise any presumption of negligence or lack of skill on his part.”
A physician, surgeon or dentist is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment in the application of his skill to the case. Roark v. Peters, 162 La. 111, 110 So. 106; Stern v. Lanng, 106 La. 738, 31 So. 303; Meyer v. St. Paul-Mercury Indemnity Co., supra; Wells v. McGehee, La.App., 39 So.2d 196; Brashears v. Peak, La.App., 19 So.2d 901; Freche v. Mary, La.App., 16 So.2d 213; Comeaux v. Miles, 9 La.App. 66, 118 So. 786. See also 70 C.J.S. Physicians and Surgeons § 41.
It was said by the Supreme Court in Phelps v. Donaldson, 243 La. 1118, 150 So.2d 35:
“We think the general rule universally obtaining on the subject matter is that: ‘When a physician undertakes the treatment of a case he does not guarantee a cure, nor is any promise to effect a cure or even a partial healing to be implied, nor does the law raise from the fact of employment an implied undertaking to cure, but only an undertaking to use ordinary skill and care. For this reason a physician cannot be held up to a standard of civil responsibility similar to that of engineers, mechanics, and shipbuilders. Of course a physician might contract specifically to cure and he would be liable on his contract for failure, but, in the absence of such a special and peculiar contract, the fact that treatment has resulted unfavorably does not even raise a presumption of want of proper care, skill, or diligence. * * * ’ 21 R.C.L. Sec. 36, p. 391. Also see 70 C.J.S. Physicians and Surgeons § 57, pp. 981, 982. ‘A dentist, like a physician or surgeon, is not an insurer or guarantor of results, in the absence of express agreement.’ 41 Am.Jur., Physicians and Surgeons, Sec. 104, p. 219.”
See also Uter v. The Bone and Joint Clinic, 249 La. 851, 192 So.2d 100; Lindsey v. Michigan Mutual Liability Co., La.App., 156 So.2d 313; Wells v. McGehee, supra; Brashears v. Peak, supra; Freche v. Mary, supra.
The oft quoted words of Justice William Howard Taft, as organ of the United States Circuit Court of Appeals, in the case of Ewing v. Goode, 6 Cir., 78 F. 442, are particularly apropos here:
“A physician is not a warrantor of cures. If the maximum, ‘Res ipsa loqui-tur,’ were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the ‘ills that flesh is heir to.’ ”
With reference to Dr. Joubert the record shows he is engaged in private practice specializing in surgery and is experienced and competent in his chosen field. His first contact with Stern was when he entered the operating room as Dr. Boyce’s assistant on the morning of April 16, 1963. He has been frequently engaged by Dr. Boyce to assist in operations since 1953. The patient had no direct contact with Dr. Joubert. Dr. Boyce adjusted the retractor and Dr. Joubert simply held it, and there is no testimony that he was in any way responsible for the injury to the spleen, pancreas, or liver during the operation.
Plaintiff has not carried the burden of proving a lack of skill on the part of Dr. *326 Boyce or Dr. Joubert, or that they did not use their best judgment in handling their patient, or that they were guilty of any acts of omission or commission which would be at variance with the medical standards prevailing in this vicinity, or that they were the least bit negligent.
For the reasons assigned, the judgment in each case appealed from is affirmed.
Affirmed.