CHASEZ, Judge.
Clarence W. Folse, Jr., brought suit for damages in the total sum of $36,000.00 against Doctor Jack R. Anderson, an Ear, Nose and Throat Specialist, for personal injuries sustained when the defendant performed plastic surgery on July 5, 1960 upon the plaintiff’s nose. He alleged that the defendant was engaged to perform surgery “merely for the purpose of correcting a slight thickening of the skin on the end of plaintiff’s nose” and that the defendant exceeded his authority in that he performed extensive surgery upon the nose with the result that his appearance was altered to his detriment, and his breathing impaired.
Alternatively, the plaintiff alleged that the defendant warranted that the surgery would improve his appearance and that he would suffer no breathing impairment; and further that these representations influenced plaintiff to undergo plastic surgery, and to suffer the change in his appearance and breathing impairment.
The defendant answered, denying liability and averred that the plaintiff consulted him in a professional capacity for surgery to improve his appearance, with full discussion of what was desired. He alleged that the plaintiff was fully cognizant of and acquiesced in all operative procedures performed, which procedures were done with high skill and care; and that any alteration of appearance was initiated by the express instructions of the plaintiff. The “negligence and fault” of the plaintiff in requesting the treatment was also pleaded.
This suit was filed on July 5, 1961. Answer was filed on December 11, 1962. A pretrial conference was held on November 19, 1963, with the plaintiff present, and trial was set for January 23, 1964. On January 20, 1964 plaintiff’s counsel withdrew. A substituted counsel placed his name of record on January 23, 1964 and the case was continued until March 30, 1964. This counsel also withdrew on March 25, 1964. On March 30, 1964, the defendant and his witnesses having appeared twice, and the plaintiff having subpoenaed his witnesses in proper person, the court ordered him to proceed with the trial. After the plaintiff called and interrogated six witnesses, the Court granted him a continuance until June 30, 1964, because of the plaintiff’s stated inability to try the case himself. He was expressly admonished by the court to obtain a lawyer, and have the lawyer prepare for trial, and the court advised him that the case would be disposed of on that day,- — regardless of whether he had a lawyer or not. Mr. Folse admitted that he had difficulty previously in securing counsel because he could not agree on who would be responsible for professional fees.
On June 30, 1964, another attorney in Mr. Folse’s employ appeared and requested a continuance, stating that he had not had enough time in which to prepare his case. This continuance was understandably denied. After a short recess, this attorney then informed the court that the plaintiff desired to try his own case, and counsel desired to withdraw, because counsel and client could not agree upon the theory of the case. The case was continued once again until November 30, 1964, the Court patiently explaining to plaintiff that there would be no more continuances and that, in all fairness to the Court and to the defendant, he would have to be ready for trial at that time.
*406 On September 29, 1964 a fourth attorney was entered of record on the plaintiff’s behalf. On November 24, 1964, Mr. Folse wrote the District Court a letter wherein he stated he was again without counsel and complained of this latter attorney’s “pro-scrastination”. On November 30, 1964 his former attorney also formally withdrew and the plaintiff finally went to trial, appearing in proper person. Judgment was rendered on December 9, 1964 in favor of the defendant, dismissing the suit of the plaintiff.
The plaintiff has taken this appeal. His contention to this Court is that, in spite of the irrelevancy of much of the testimony in the record, there is evidence to show that there is a serious risk in submitting to a rhinoplasty, both from a cosmetic and breathing standpoint, and this risk was not imparted to the plaintiff, who was instead, led to believe that a proper breathing function was guaranteed and assured. Further, it is contended, the record indicates, that as a result of the operation the breathing function actually had been impaired.
We find that we cannot accept these contentions inasmuch as the fact conclusions of the judge to the contrary are borne ■out by the record. In addition to the plaintiff and the defendant, several reputable physicians testified, all called by the plaintiff and most of whom the plaintiff had •seen relative to his nose. Some freely testified as experts for the plaintiff without guarantee of their expert fees. We will briefly recapitulate what we consider the pertinent testimony.
Dr. Harold V. Cummings testified that he had given the plaintiff a general physical examination in October of 1959 and observed no breathing impairment of the nose. He also advised him to see a psychiatrist. Dr. Joseph D. Landry also examined the plaintiff and found nothing to indicate a breathing impairment at the time, prior to the operation. He found him a perfectly normal individual.
Dr. James W. Burkes performed a derma-brasion on the plaintiff’s face on June 10, 1960 to remove acne scars from the plaintiff’s face. The plaintiff complained of scar tissue on the end of his nose and he was told a dermabrasion would not aid it. He also referred Mr. Folse to Dr. Anderson and testified that the plaintiff, to his knowledge, had previous dermabrasions. Dr. Robert J. Meade testified that he had given the plaintiff a dermabrasion in 1959.
Clarence Folse went to see Dr. Anderson relative to having some treatment for his nose. After several visits, a rhinoplasty was performed on July 5, 1960. Dr. Anderson stated the results were “certainly within normal limits, they were acceptable results.” He explained the steps performed, removing the nasal hump, narrowing the nose, shortening the nose somewhat and working on the tip of the nose. The patient’s post-operative course appeared satisfactory. On July 11, 1960 the patient expressed dissatisfaction with the results and the doctor explained that temporary distortion was expected after the operation. A chin implant had also been made on the doctor’s suggestion, and this the plaintiff ordered taken out on this occasion. On July 21, the patient said that he was breathing well most of the time and examination of the nose revealed it to be satisfactory. On August 5, 1960 Mr. Folse complained of intermittent breathing blockage and of some swelling, which was not unusual. On August 20, 1960 the patient called to express his dissatisfaction with the nose, and felt that the tip was too far up in the air. On August 22, 1960 the patient came in to express further dissatisfaction with the appearance of his nose. On August 25, 1960 arrangements were made on behalf of the patient for a cartilage graft along the dorsum of the nose in order to alter its appearance, despite the advice of Dr. Anderson to await further developments which would come in time. However, the plaintiff decided not to go through with the operation. On August 30, 1960 the plaintiff complained of night breathing difficulty for which a decongestant antihistamine was prescribed. September 1, *407 1960 was the last time the doctor talked to Mr. Folse, when Mr. Folse stated he wanted his nose “cut down” and the doctor advised him to wait for the nose to heal in several months.
Dr. Robert F. Ryan saw the plaintiff in August of 1960 either once or twice, one visit being on August 30, 1960. The plaintiff was disturbed about the appearance and the function of his nose. This doctor recommended he go back to Dr. Anderson and told him that he believed the results would improve in time, and if he were dissatisfied from a cosmetic standpoint, to see Dr. Richard Vincent, or for function to see another named physician. Dr. Ryan saw a large amount of edema and swelling from the operation, which would be expected at that period of time after the rhinoplasty.
Dr. Richard A. Vincent, a plastic surgeon, testified the plaintiff saw him on September 9, 1960 and was concerned about his appearance. He advised the plaintiff to await the full results of the operation. On the 28th of September Doctor Vincent suggested that the plaintiff be referred to an Ear, Nose and Throat specialist who perhaps could perform an operation to alleviate the plaintiff’s complaints. On the 14th of November, there was no history of allergy, but the doctor felt he ought to be seen by an otolaryngologist. In January of 1961 there was no change. On March 20, 1961, the patient had “marked congestion of all mucous membranes.” The doctor referred him to a physician in St. Louis. Dr. Vincent felt that the rhino-plasty met or exceeded the standards of this locality.
As near as we can discern, the plaintiff was seen by Dr. Meade again in the Spring or Summer of 1961. He testified as an expert plastic surgeon. He said the plaintiff was concerned about the appearance of his nose, and he felt that the plaintiff was “overbreathing” which was the cause of his breathing difficulty, which he felt had become a fixation. He also recommended that the plaintiff see a psychiatrist. He felt that the plaintiff had received a good rhinoplasty, which did not cause any significant disability and which had met the standards of medical care.
Doctor Meade had also written a letter to the draft board, concerning the plaintiff, in which the statement was made: “He is having some difficulty breathing through his nose because of inadequate alar support. This causes quite a bit of concern to the patient.” He explained this at the trial by stating that Mr. Folse didn’t “have sufficient alar support to sustain him under violent exercise * * * ” and that he would not have difficulty breathing under normal circumstances, in his opinion.
Dr. Paul B. Lastrapes saw the plaintiff on June 9, 1961 and diagnosed allergic rhinitis. He stated he would • not have known of the operation to the plaintiff’s nose if the plaintiff hadn’t so informed him.
Dr. William A. Wagner, an Ear, Nose and Throat specialist, testified as an expert for the plaintiff. He also saw the plaintiff between November 2, 1961 and July 30, 1962. On November 2, 1961 this doctor diagnosed a mild ethmoid infection, (probably more infection of the left eth-moid), and a nasal bacterial allergy. There was a swelling of the turbinates, probably due to allergy. He stated there was no obstruction due to the previous surgery and that the plaintiff had a “nice looking” nose anatomically. At the time he saw this physician Mr. Folse was using a “gadget” to hold his nose open, and which Dr. Wagner demonstrated was of no aid, and he advised him not to use it.
Dr. Ashton Thomas testified as an expert in the field of Otorhinolaryngology. This evidence was difficult to comprehend precisely, since plaintiff tried his own case.
The doctor saw the plaintiff on July 30, 1962, when the plaintiff complained of having difficulty in his breathing, particularly on his left side. He noticed a deviation of the septum, a slight bulge “in the *408 region of the attachment of the upper lateral cartilage, the juncture of which we call the nasal valve.” This bulge the doctor considered to be in a “rather vital area.” He operated on the plaintiff twice. The first time, he encountered thick scar tissue, and stated that this was an uncontrollable factor of rhinoplasty. Some of the redundant tissue was cut away. He also operated on the plaintiff a second time, July 24, 1963. The pre-operative diagnosis was “nasal obstruction due to vasomotor rhinitis” as well as “lack of consistency in rigidity in the valvular area,” this latter being caused by exuberance of the healing in the area.
Also the doctor stated in his testimony that two procedures were performed, one, to straighten out the buckling of the septum and the other was to attempt to bring the upper lateral cartilage away from the septum. A second operation was performed because the doctor was convinced the patient had a terrific turgescence of the inferior turbinates, and included a submu-cous resection of the turbinate. There was also outfracture of the nasal bones and a silicone implant over the dorsum of the nose in the valve. Doctor Thomas also stated that the plaintiff had rhinitis most of the time, and probably ethmoiditis which he did not search for.
On cross examination Dr. Thomas stated that he felt that, after his first operation, there was no obstruction to the patient’s breathing to justify his complaints subsequent thereto. The patient also became dissatisfied with the results of the second operation although the doctor felt the nose looked “excellent”. Dr. Thomas likewise testified that the gadget Mr. Folse was using was of no use and could cause harm.
Doctor Anderson testified that he had warned Mr. Folse that there would be nasal blockage for a period of time. He testified that Folse had seen him four times prior to the operation, that he and the patient understood what the goals of the operation were, and that Folse had said he would leave it to him “as to what I thought we should try to get him.” In addition to this, Mr. Folse received a standard pamphlet from the doctor which outlined the discomforts that would attend the rhinoplasty.
Clarence Folse testified on his own behalf that he did not expect the complete rhinoplasty, but only wanted work to be done on the tip of his nose, that he was not warned of the risks of the operation or of the congestion that would follow. He testified that he was worried about the appearance of his nose at first after the operation, and then became concerned about the breathing impairment which did ont improve. He stated he was discharged from the Army because of his nasal condition. He stated that Doctor Cummings merely concurred in his own expressed thought that perhaps he should see a psychiatrist since he was nervous as a result of hormonal imbalance. “Before” and “after” pictures were introduced in evidence. We do not know how reliable these photographs are, but we see no noticeable deformity after the operation. Further, they were taken within seven months of the operation and the final developments of the nose may not yet have been present.
We cannot come to a conclusion that the Court erred in finding that the plaintiff had not proved his case under the evidence outlined above. All of the medical witnesses called by the plaintiff, in general, testified unfavorably to his cause. There is nothing here on which a court could predicate a finding of negligence or breach of warranty on the part of Dr. Anderson. Indeed, the evidence was to the contrary. We find that Dr. Anderson did not guarantee results to the plaintiff, that he informed the plaintiff of the post-operative discomforts, and the positive evidence shows that the rhinoplasty was an excellent result.
The law applicable to cases of this type has been recently set out in the case of *409 Stern v. Boyce et al., La.App., 200 So.2d 318, by this Circuit:
“It is incumbent on the physician or surgeon who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying that skill to the given cáse he used reasonable care and diligence along with his best judgment. Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781.
“In Mournet v. Sumner, 19 La.App. 346, 139 So. 728, our predecessors said:
‘The rule is well established that a physician or dentist cannot be held liable for the death of a patient under his treatment, where there is no evidence to show negligence or lack of skill on his part, sufficient to overcome the prima facie case in his favor made by the evidence that the treatment adopted by him was the usual and customary one. The fact that a patient died under such circumstances does not raise any presumption of negligence or lack of skill on his part.’
“A physician, surgeon or dentist is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment in the application of his skill to the case. Roark v. Peters, 162 La. 111, 110 So. 106; Stern v. Lanng, 106 La. 738, 31 So. 303; Meyer v. St. Paul-Mercury Indemnity Co., supra; Wells v. McGehee, La.App., 39 So.2d 196; Brashears v. Peak, La.App., 19 So.2d 901; Freche v. Mary, La.App., 16 So.2d 213; Comeaux v. Miles, 9 La.App. 66, 118 So. 786. See also 70 C.J.S. Physicians and Surgeons § 41.
“It was said by the Supreme Court in Phelps v. Donaldson, 243 La. 1118, 150 So.2d 35:
‘We think the general rule universally obtaining on the subject matter is that: ‘When a physician undertakes the treatment of a case he does not guarantee a cure, nor is any promise to effect a cure or even a partial healing to be implied, nor does the law raise from the fact of employment an implied undertaking to cure, but only an undertaking to use ordinary skill and care. For this reason a physician cannot be held up to' a standard of civil responsibility similar to that of engineers, mechanics, and shipbuilders. Of course a physician might contract specifically to cure and he would be liable on his contract for failure, but, in the absence of such a special and peculiar contract, the fact that treatment has resulted unfavorably does not even raise a presumption of want of proper care, skill, or diligence. * * * ’ 21 R.C.L. Sec. 36, p. 391. Also see 70 C.J.S. Physicians and Surgeons § 57, pp. 981, 982. ‘A dentist, like a physician or surgeon, is not an insurer or guarantor of results, in the absence of express agreement.’ 41 Am.Jur., Physicians and Surgeons, Sec. 104, p. 219.”
“See also Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100; Lindsey v. Michigan Mutual Liability Co., La.App., 156 So.2d 313; Wells v. McGehee, supra; Brashears v. Peak, supra; Freche v. Mary, supra.
“The oft quoted words of Justice William Howard Taft, as organ of the United States Circuit Court of Appeals, in the case of Ewing v. Goode, 78 F. 442, are particularly apropos here:
“ ‘A physician is not a warrantor of cures. If the maximum, “Res ipsa loquitur,” were applicable to a case like this, and a failure to cure were held to-be evidence, however slight, of negligence-on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all ‘ the “ills that flesh is heir to.” ’ ”
*410 With reference to Dr. Anderson, the record shows he is engaged in private practice as an Ear, Nose and Throat specialist and is experienced and competent in his chosen field. The plaintiff has not carried the burden of proving lack of skill on the part of Dr. Anderson or that he did not use his best judgment in handling his patient, or that he was guilty of any acts of omission or commission which would be at variance with the medical standards prevailing in this vicinity, or that he was in any way negligent.
The judgment of the Court a qua therefore is affirmed, costs to be borne by plaintiff.
Affirmed.